UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

DR. ARIF S. IZMIRLIGIL,                                     Civil Action No:

            Plaintiff,

                     Jury Trial Demanded

      -against-
                     **VERIFIED**
SELECT PORTFOLIO SERVICING, INC.,        **COMPLAINT**
AMERICAN SECURITY INSURANCE
COMPANY, and ASSURANT, INC.,

            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

      Plaintiff, DR. ARIF S. IZMIRLIGIL, (hereinafter referred to as "Plaintiff" or

"Izmirligil") by his attorneys, The Law Offices of David L. Singer, P.C. sets forth the following

upon information and belief as and for his verified complaint, against, Defendants, SELECT

PORTFOLIO SERVICING, INC. (hereinafter referred to as "SPS"), AMERICAN SECURITY

INSURANCE COMPANY (hereinafter referred to as "ASIC"), and ASSURANT, INC.

(hereinafter referred to as "Assurant"), and collectively referred to herein as Defendants:

## NATURE OF THE ACTION

      1.     Plaintiff, a residential homeowner, having previously opted out of a class action

against Defendants, brings this action for monetary relief and injunctive relief relating to

Defendants misconduct and wrongdoing in procuring and issuing a forced placed insurance

policy on his residence.

## PARTIES

      2.     Plaintiff, is a natural person residing in the State of New York, County of Suffolk.

Plaintiff is the owner of the residential property known as 15 Sailors Court, Miller Place, New

York 11764, that is the subject of this action. Plaintiff was charged $10,032.00 per annum by SPS purportedly to reimburse it for the cost of force-placed hazard insurance with respect to the period of November 1, 2013 to present, even when the property owner Izmirligil already had adequate insurance. The force-placed coverage was obtained by SPS from Defendant Assurant through its wholly-owned subsidiary Defendant ASIC.

3.      Defendant, SPS, is a Utah Corporation and a residential loan servicing company with offices s in Jacksonville, Florida and Salt Lake City, Utah. SPS is the former Fairbanks Capital Corporation, which changed its name to Select Portfolio Servicing, Inc., in June 2004 and regularly conducts business in the State of New York and throughout the United States. SPS is currently the sub-servicer of The Bank of New York Mellon f/k/a The Bank of New York, as Trustee for CMFT 2006-S2 Series, and has been acting as such since November 1, 2013. Pursuant to its Subservicing Protocol, SPS replaced J.P. Morgan Chase Bank, N.A. (the first servicer and originator of the loan that is currently acting as the Paying Agent of the Trust) as the servicer for Izmirligil's mortgage loan as a consequence of the $13 billion RMBS fraud settlement entered into by JPMCB.

4.      Defendant, Assurant, is a Delaware Corporation which is headquartered at One Chase Manhattan Plaza, New York, New York 10005. According to its website, Assurant is a provider of a specialized insurance products including "Lender-placed" homeowners' insurance or FPI (see "About us", www.assurant.com/about/). According to Assurant's Annual Reports as filed with the Securities and Exchange Commission ("SEC") on SEC Form 10-K, "the majority of [Assurant's] lender-placed agreements are exclusive" and those agreements require the Assurant Defendants to "automatically issue these policies when a borrower's insurance coverage is not maintained." Assurant has four operating segments—Assurant Solutions, Assurant

2

Specialty Property, Assurant Health, and Assurant Employee Benefits. Assurant, along with QBE Insurance Group, LTD. controls about 90% of the force-placed insurance market. Assurant offers its force-placed (lender-placed) insurance products through the Assurant Specialty Property Segment. "The largest product line within Assurant Specialty Property is homeowners' insurance, consisting principally of fire and dwelling hazard insurance offered through [Assurant's] lender-placed programs". Assurant's Form 10-K for the year endings, filed by SEC, at 4. Assurant uses "a proprietary Insurance-tracking administration system linked with administrative systems of our clients to continuously monitor the clients' mortgage portfolios to verify the existence of insurance on each mortgaged property and identify those that are uninsured" and when a lapse is confirmed, "a lender-placed policy is procured by the lender".

5.      Defendant, ASIC, is an insurance company writing force-placed insurance policies throughout all fifty (50) states of The United States of America, and the District of Columbia. ASIC's has its principal offices in Atlanta, Georgia. ASIC is a wholly owned subsidiary of Interfinancial, Inc, which in turn is a wholly owned subsidiary of Defendant, Assurant. ASIC is one of Assurant's exclusive force-placed insurance providers. ASIC sometimes operates under the trade names such as Assurant Solutions and Assurant Specialty Property. ASIC contracts with SPS, whereby it acts as a force-placed insurance vendor to SPS. ASIC's duties include, but are not limited to, tracking loans in SPS's mortgage loan portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties in the event that a borrower's homeowners' insurance policy has lapsed.

6.      ASIC force-placed dwelling hazard insurance on the Plaintiff's home despite the fact that he has continuously maintained an effective and valid hazard insurance policy on that home since July 26, 2006, until present, the premium for which is voluntarily paid to Scottsdale

3

Insurance, Inc. At present, the premium for that same hazard insurance policy in the amount of $2,872.00 is being paid from the Izmirligil's escrow account by the Defendant, SPS.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C §1331 and 18 USC §1964(c).

8.     This Court also has supplemental Jurisdiction over Plaintiff's N.Y. State Law claims pursuant to 28 U.S.C §1367(a).

9.     Venue is proper in this District under 28 U.S.C §1391(b), and 18 U.S.C §§1965(b) as Plaintiff resides in and Defendants regularly conduct business in the Eastern District of New York.

## FACTS COMMON TO ALL CAUSES OF ACTION

The Class Action

10.     Plaintiff, a residential homeowner, previously opted out of a class action against Defendants. A copy of the opt-out letter is annexed as **Exhibit "13"**. That class action is titled "Juan Almanzar and Jocelyn Evans, et al v. Select Portfolio Servicing, Inc, Standard Guaranty Insurance Company, American Security Insurance Company, and Voyager Indemnity Insurance Company," pending in the U.S District Court, Southern District of Florida, and bearing the Case No: 14-cv-22586 ("The Class Action"). The plaintiff's complaint in The Class Action set forth claims for defendants' violation of RICO statute, Consumer Fraud Act, TILA, Breach of Contract, Breach of the Implied Covenant of Good Faith, Unjust Enrichment, and Breach of Fiduciary Duty. The Class Action was settled for $40.6 million in monetary relief to a 166,006-member settlement class, and $4.15 million in attorney's fees and expenses, ("The Class Action Settlement"). The Class Action Settlement was achieved after U.S. District Court Judge Moreno

4

denied the defendants' motion to dismiss The Class Action. A copy of the Judge's Order in The Class Action is annexed hereto as **Exhibit "1"**.

11.    Izmirligil has opted out of The Class Action and elected to bring his claims individually, against SPS, ASIC, and Assurant.

12.    Izmirligil continuously maintained hazard insurance coverage for his residential property, whereas the other class-member's coverage had lapsed allowing the lender, banks, or servicer to force-place insurance (such insurance is hereinafter referred to as "FPI" or "LPI"), when/if the coverage is lapsed. In the case at bar, the Defendants, undoubtedly engaged in a variety of abusive practices, including procuring and issuing a force-placed insurance policy on Izmirligil's home and charging him for it when such FPI or LPI was absolutely not required.

13.    Izmirligil provided Defendants with a copy of proof of his adequate and effective hazard insurance policy coverage with Scottsdale Insurance, Inc. ("Scottsdale"). In fact, in 2014, servicer, SPS was using Izmirligil's escrow account to pay Scottsdale for that hazard insurance coverage, while at the same time charging Izmirligil exorbitant rates for LPI that was completely unnecessary.

14.    Plaintiff brings this suit to recover monetary relief for the damages and wrongdoing that he has suffered at the hands of the Defendants and for injunctive relief to ensure that Defendants are enjoined by this Court from continuing these illegal practices since SPS is still acting as the mandatory sub-servicer for The Bank of New York Mellon f/k/a The Bank of New York, as Trustee for CMFT Series 2006-2 ("BONYM") with respect to Izmirligil's mortgage loan as per $13 billion settlement agreement since November 1, 2013 and since SPS is still prosecuting a foreclosure action against Izmirligil even though Izmirligil's disputed mortgage loan has technically been settled and the monies owed have been paid to BONYM by

the loan originator and first servicer J.P. Morgan Chase Bank, NA ("JPMCB") pursuant to the

$13 billion Residential Mortgage-Backed Securities ("RMBS") fraud settlement" entered into

between BONYM, JPMCB, Federal and State Government entities. A full copy of $13 Billion

RMBS Fraud Settlement is available at https://www.justice.gov/opa/pr/justice-department-

federal-and-state-partners-secure-record-13-billion-global-settlement.


Defendant SPS's Prior Misconduct – Stipulation, Modified Stip, Penalty and Injunctive Relief

15.     SPS engaged in prior misconduct and was penalized for it. SPS was enjoined from

engaging in certain conduct however, it has violated those prohibitions with respect to the

misconduct that they have perpetrated against Izmirligil and others.

16.     Initially, on November 21, 2003, in the United States District Court for the

District of Massachusetts in a matter bearing Case No: 03-cv-12219 (DPW), U.S. District Judge

Douglas P. Woodlock set forth an order "Preliminary Approving Stipulated Final Judgment" as to

Fairbanks Capital Corp., and Fairbank's Capital Holding Corp where Plaintiff, the United States

of America was acting upon notification and authorization to the Attorney General by the Federal

Trade Commission ("FTC") and the Secretary of the Department of Housing and Urban

Development ("HUD") which charged the defendant Fairbanks, with engaging in a number of

unfair, deceptive, and illegal practices in the servicing of subprime mortgage loans and agreed to

pay $40 million to settle with the FTC and HUD, ("2003 Settlement") A copy of the 2003

Settlement is available at www.ftc.gov/news-events/press-releases/2003/11/fairbanks-capital-

settles-ftc-and-HUD-charges.

17.     The settlement also imposed a number of specific limitations on the SPS's ability

to charge certain fees and to engage in certain practices in connection with servicing mortgage

loans. In mid-2004, Fairbanks Capital Corp changed its name to Select Portfolio Servicing, Inc., (SPS) while Fairbanks Capital Holding Corp. changed its name to SPS Holding Corp.

18.     In 2005, Credit Suisse First Boston (USA), Inc. now known as Credit Suisse, purchased SPS and its parent holding company for $144.4 million.

19.     On September 4, 2007, the FTC conducted a review of SPS's compliance with certain aspects of the 2003 Settlement. As a consequence of that review, both parties agreed to entry of the "Modified Stipulated Final Judgment and Order and Injunctive Relief" as to SPS, ("2007 Modified Stipulation"). As per this agreement, SPS was permanently restrained and enjoined from the following, with respect to the servicing of any mortgage loan:

INJUNCTIVE RELIEF—I;

A.     Failing to apply all amounts accepted in connection with a loan against interest and principal due....;

B.     Failing to accept as of the date of receipt, or to credit effective as of the date of receipts, amounts paid in connection with a loan....;

C.     Failing, in the event that Defendants do not credit a payment, to send within five (5) business days of receipt of that payment...;

D.     Misrepresenting, expressly or by implication, any amount that a consumer owes;

E.     Misrepresenting, expressly or by implication, that any fee is allowed under the loan instruments, permitted by law, or imposed for services actually rendered;

F.     Misrepresenting, expressly or by implication, the amount, nature, or terms of any fee or other condition or requirement of any loan, and;

G.     Failing to make disbursements of escrow funds for insurance, taxes, and other charges with respect to the property in a timely manner. (See, Injunctive Relief—I, at page 6,7,8).

INJUNCTIVE RELIEF—II;

.... that Defendants...are permanently restrained and enjoined, in connection with the servicing of any loan, from;

A.      Charging for "force-placed Insurance" before mailing, at no cost to the consumer, at least two (2) written notices to the consumer providing clear and conspicuous notice of the procedures by which the consumer may demonstrate that the consumer already has Insurance coverage and providing at least thirty (30) calendar days from the mailing (by first-class mail) of the first notice and twenty (20) calendar days from the mailing (by certified mail) of the second notice for the consumer to demonstrate coverage, provided that, the second notice shall not be mailed until the first thirty-day period has expired…;

H.      Failing to accept any reasonable form of confirmation from a consumer of existing insurance coverage, including verbal confirmation of the existing insurance policy number along with the identity of the insurance company or agent;

I.      Force-placing Insurance on a consumer's home when Defendants know or fail to take reasonable actions to determine whether such insurance is already in place;

J.      Failing within fifteen (15) days of receipt of confirmation of a consumer's existing insurance coverage, to refund all force placed insurance premium paid during the overlapping coverage period and any related fees charged to the consumer's account during the overlapping coverage periods; and,

K.      Placing a consumer's loan in default, assessing late fees or initiating foreclosure proceedings solely due to the consumer's nonpayment of insurance premiums, provided that the insurance charges may become additional debt of the consumer secured by the security instrument and interest may be charged thereon as provided in the loan instruments. (See, Injunctive Relief—II, at page 8,9).

INJUNCTIVE RELIEF—III;

…that Defendants…are permanently restrained and enjoined, in connection with the servicing of any loan, from assessing and/or collecting any fee unless it is for services actually rendered and is (a) expressly authorized, and clearly and conspicuously disclosed, by the loan instruments and not prohibited by law; (b) expressly permitted by law and not prohibited by the loan instruments; or (c) a reasonable fee for a specific service requested by a consumer that is assessed and/or collected only after clear and conspicuous disclosure of the fee is provided to the consumer and explicit consent is obtained from the consumer to pay the fee in exchange for the service, and such fee is not otherwise prohibited by law or the loan instruments. (See, Injunctive Relief—III, at page 9-10) …

INJUNCTIVE RELIEF—VIII;

…that nothing in this Modified Order shall permit the Defendants to impose any

fee or take any other action that is prohibited by any State or Federal law or regulation and/or prohibited by the loan instruments and/or other contractual agreement with the consumer. (See Injunctive Relief—VIII, at page 13) ...;

INJUNCTIVE RELIEF—IX;

...that Defendants...are permanently restrained and enjoined, in connection with the servicing of any loan that was in default at the time it was obtained by Defendants, from:

A.      Using any false, deceptive, or misleading representation or means in connection with the collection of any debt, in violation of Section 807 of the FDCPA, 15 U.S.C §1692e, including but not limited to: (1) falsely representing the character, amount, or legal status of a debt, or any services rendered or compensation which may be lawfully received by a debt collector for collection of a debt, in violation of Sections 807(2)(A) and (B) of the FDCPA, 15 U.S.C §§1692e(2)(A) and (B);

(2) communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed, in violation of Section 807(8) of the FDCPA, 15 U.S.C §1692e (8); and (3) using false representations or deceptive means to collect or attempt to collect a debt or to obtain information concerning a consumer, in violation of Section 807(10) of the FDCPA, 15 U.S.C §1692e (10);

L.      Using any unfair means to collect or attempt to collect a debt, including but not limited to collecting amounts (including any interest, fee, charge, or expense incidental to the principal obligation) not authorized by the agreement creating the debt or permitted by law, in violation of Section 808(1) of the FDCPA, 15 U.S.C §1692(f);

M.      Failing to notify consumers of their right to dispute and obtain verification of their debts and to obtain the name of the original creditor, either in the initial communication with consumers by Defendants, or within five days thereafter, in violation of Section 809(a) of the FDCPA, 15 U.S.C §1692g(a); and

N.      Failing to comply in any other respect with the FDCPA, as amended, or as it may be amended in the future. (See Injunctive Relief—IX, at page 13, 14, 15) ...

INJUNCTIVE RELIEF—XIV;

....that Defendants...are permanently restrained and enjoined, in connection with the servicing of any loan, from taking any action toward foreclosure until the

9

Defendants have: (a) reviewed any records pertaining to the consumer's loan to verify that the consumer has failed to make three full monthly payments; (b) confirmed that the consumer has not been subject to any of the acts or practices prohibited by this Modified Order, the loan instruments, or law, or if such acts or practices have occurred, that Defendants have remedied them; (c) investigated and disputed by the consumer and informed the consumer of the results of the investigation. Defendants shall maintain records sufficient to document the steps they take to investigate and conclude each dispute. (See Injunctive Relief—XIV, at page 20-21)

The 2007 Modified Stipulation is available at:
https://www.ftc.gov/sites/default/files/documents/cases/2007/08/070802selectportfoliomodiified stip.pdf

20.     Despite this injunction, SPS continued to engage in prohibited behavior with respect to its servicing of mortgage loan, including Izmirligil's mortgage loan.

Assurant's Prior Misconduct and Settlement of NYDFS Investigation with $14 Million Penalty

21.     Defendant Assurant also previously came under investigation by governmental authorities in connection with their misconduct.

22.     On March 21, 2013, the New York Department of Financial Services ("NYDFS") launched an investigation into force-placed insurance practices that produced a major settlement with the country's largest "force-placed" insurer, Assurant Inc, and its subsidiaries, including ASIC. ("ASIC Settlement") The ASIC Settlement included restitution for homeowners who were harmed by the conduct of the force placed insurers, a $14 million penalty to be paid to the State of New York and industry-leading reforms designed to save homeowners, taxpayers, and investors millions of dollars going forward through lower rates. Further, under the Consent Order that was entered into, Assurant and subsidiaries, including ASIC, are prohibited from paying commissions to any mortgage loan servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer, see NYDFS Consent Order against Assurant, ASIC, and ABIC, March 21, 2013, available at http:/www.dfs.ny.gov/assurant-forced-placed-

insurance. A copy of the NYDFS Consent Order is annexed hereto as **Exhibit "18"**.

23.    The ASIC Settlement made it apparent that Assurant, its subsidiaries including ASIC and major mortgage lenders including, J.P. Morgan Chase Bank, NA ("JPMCB") (JPMCB owns Assurant and its subsidiaries ASIC and ABIC) and their servicers, including SPS, devised a fraudulent scheme whereby Assurant's subsidiaries would offer loan-tracking and insurance placement services to the lenders and pay them unearned kickbacks—essentially bribes—in exchange for an exclusive contractual relationship. The kickbacks to the lenders and mortgage servicers take many forms, and are often characterized as legitimate payments to conceal their actual purpose from consumers. For example, the kickbacks are often characterized as "Commissions" paid to an affiliate of the lender for brokerage services, but are in fact cycled through the affiliate, which does no work regarding the borrower's forced-placement, and paid back to the Lender as pure profit. Kickbacks may also take the form of captive reinsurance arrangements, direct payments, "expense reimbursements", debt forgiveness, or discounted administrative services. Over time, these schemes have reaped the major mortgage lenders, including JPMCB and its sub-servicer, SPS, Assurant and ASIC, hundreds of millions of dollars in illegal and unearned profits.

24.    Izmirligil's insurance coverage never lapsed, however, these investigations, related Consent Orders, and lawsuits, including the ASIC Settlement, revealed that:

   (a) Every mortgage contract included a provision that allowed the bank/servicer to force-place insurance if the coverage lapsed. A copy of the relevant portion of Izmirligil's mortgage is annexed hereto as **Exhibit "8"**.

   (b) Many homeowners had such coverage lapse;

   (c) The contracts do not specify the actual "cost" of the force-placed insurance, and;

(d) Fannie Mae and Freddie Mac guaranteed most of the mortgages, so that if the homeowner did not pay such charges, the government would eventually pay such amounts.

25.     Assurant, its subsidiaries, here ASIC, and the mortgage lenders (here, JPMCB which is not part of this action) and its sub-servicer SPS, concealed these fraudulent practices from the public for many years. At the same time, SPS deceitfully continued to maintain The 2009 Foreclosure Action and in doing so, submitted affidavits of Diane Weinberger's and Kajay Williams that contained false information relating to the mismanaged escrow account for Izmirligil's mortgage loan and filed the affidavits with the Court in support of its first and subsequent applications for an order of reference in The 2009 Foreclosure Action.

26.     Izmirligil has been damaged, and is continuously being damaged, as a result of the Defendants' violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C §1961, et seq. ("RICO"); Conspiracy to Violate the RICO Act; and violation of applicable NY State Laws, Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing and Breach of Fiduciary Duty under the mortgage agreement; pursuant to Common Law Restitution; Unjust Enrichment; Disgorgement; and Aiding and Abetting a Breach of Fiduciary Duty.

27.     Specifically, Izmirligil was charged the costs associated with force-placed hazard insurance for his home—fraudulently— beginning on or around November 1, 2013 to the present, in the amount of $10,032.00 per annum even though Izmirligil's coverage never lapsed and he has never needed additional coverage, in connection with his disputed loan serviced by SPS. A copy of the Policy Declarations showing that Izmirligil maintained insurance from 2013 through the present is annexed hereto as **Exhibit "7"**. A copy of the force-placed declaration is annexed as **Exhibit "4".**

28.     Furthermore, SPS has already conceded their violations against Izmirligil in their correspondence dated January 27, 2016. A copy of this correspondence is annexed hereto as **Exhibit**

**"15"**.

29.     Additionally, SPS has failed to correct their conduct, despite Izmirligil's multiple demands that proper corrections be made to his escrow account. A copy of Izmirligil's second letter sent to SPS and ASIC is annexed hereto as **Exhibit "5"**.

30.     Plaintiff is NOT challenging the reasonableness or propriety of the rate charged, but rather suing for the damage done to him by Defendants' egregious conduct where, as here, defendants' unauthorized charges even for $1, would be too much and be violative of Izmirligil's rights in these circumstances.

Izmirligil's Other Related Litigation

31.     Izmirligil is also the Defendant in a pending residential mortgage foreclosure case pending in the Supreme Court, Suffolk County and bearing Index No.: 47361/2009, (The "2009 Foreclosure Action"). The 2009 Foreclosure Action and another case pending in the Supreme Court, Suffolk County, bearing the Index No: 612313/2015, Izmirligil v. Steven J. Baum, et al ("The 2015 RICO Action) are currently being presided over by Hon. Antonio I. Brandveen, J.S.C., who is the visiting Justice from the Supreme Court of Nassau County, pursuant to Administrative Order 288/2016 ("AO/288/16") of Deputy Chief Administrative Judge Coccoma and Judge Eng of Second Department of Appellate Division, after mandatory disqualification and/or recusal of the previous presiding Judges, Whelan, Cohen, and Hinrichs, in addition to the voluntary recusal of the nineteen (19) other Justices of the Supreme Court of Suffolk County.

32.     The 2009 Foreclosure Action is the only foreclosure case in the entire NYS Unified Court System where the previous presiding Judge Thomas F. Whelan declared that the Administrative Orders ("AO/431/11") are invalid and unconstitutional and allowed the foreclosing plaintiff, Bank of New York Mellon ("BONYM") to proceed without complying

with AO/431/11, contrary to the numerous Appellate Court's decisions from every Department commanding that AO/431/11 is valid, mandatory and Constitutional.

33.     On November 30, 2016, the Second Department issued two orders reversing Justice Whelan by ordering that AO/431/11 is valid and constitutional, and also subsequently canceled the order of reference that had previously been granted. To date, foreclosing plaintiff, BONYM, did not comply with the mandatory AO/431/11. However, its sub-servicer SPS's affiant Diane Weinberger attempted to fool the Court by deceitfully altering and redacting the strict language of AO/431/11 in her sworn affidavit in which Weinberger candidly admitted that she cannot verify the validity of any affidavit and/or the notarization of any sworn documents in the 2009 foreclosure case, including affidavit of services of the process server, A & J Process Serving, Inc that mandates the dismissal of the 2009 foreclosure action against Izmirligil, where SPS is not the party in the 2009 litigation.

34.     Currently, Izmirligil's motion to dismiss The 2009 Foreclosure Action based on the Court's lack of personal jurisdiction due to the defective RPAPL §1303 notice, lack of RPAPL §1304 notice, and due to the improper 30-day Default Notice is pending decision.


Defendants' Forced-placed Insurance Operations Harmed Izmirligil

35.     SPS and the other Defendants engaged in fraudulent, deceptive, and unfair force-placed insurance practices by forcing Izmirligil to pay the high cost of unnecessary, duplicative, and excessive coverage when he already has adequate hazard insurance, simply to increase its profits.

36.     This conduct is not only a clear violation of Federal and State Law but also a clear violation of the "Restraining Order and Injunctive Relief" of the US District Judge

Douglas P. Woodlock, in the U.S District Court for the District of Massachusetts bearing the case No: 03-cv-12219 dated September 4, 2007 and entered against SPS.

37.     SPS's unquestionably fraudulent and deceptive conduct "artificially" created a lapse that did not exist and "artificially" inflated the high cost of hazard insurance Izmirligil's property.

38.     An undisclosed exclusive arrangement existed between SPS and Assurant and ASIC to manipulate the forced-placed insurance process and "artificially" inflate the amounts charged to Izmirligil. The amounts of $10,032.00 per annum charged for the exact same hazard insurance coverage which was already paid in the amount of $2,872.00, to Izmirligil are clearly and excessively inflated to provide SPS and its affiliates with kickbacks and bribes disguised as "commissions", reinsurance payments, "expense reimbursements", "direct payments", "debt forgiveness", or to "cover the cost of discounted services", as well as to include other unmerited charges.

39.     Izmirligil was forced to pay the inflated charges for the artificially created forced-place insurance even though Izmirligil has always had adequate hazard insurance from the date of closing of his mortgage loan - July 26, 2006 to present.

40.     It is beyond dispute that Defendants charged Izmirligil for redundant or otherwise unnecessary hazard insurance which was inappropriately originated and priced for the Izmirligil's property that is unnecessary, duplicative, and in amounts greater than required by law or his mortgage agreement where Izmirligil had never lapsed his insurance coverage.

41.     Motivated by the lucrative financial incentive with force-placing insurance, Defendants have fraudulently created and required Izmirligil to pay for unnecessary insurance coverage; and further required Izmirligil to pay for unnecessary insurance coverage that exceeds

the amount necessary to protect the mortgage's interest in the secured property; backdated an unnecessary force-placed insurance policy so that they cover time periods already passed when the policy is placed, thus required Izmirligil to pay for retroactive coverage for by-gone periods of time for which no risk of loss still exists; required Izmirligil to pay for unnecessary force-placed insurance policy covering periods of time without even following a lapse of previous insurance, despite the fact that the lender's interest in the property was covered for such time pursuant to either a "standard mortgagee clause", in prior policies which extend coverage for a period of time beyond the cancellation date.

42.     Izmirligil should not be charged for retroactive insurance. The NAIC has indicated that insurance is "prospective in nature" and that insurance policies "should not be back-dated to collect premiums for a time period that has already passed. It was unlawful that Izmirligil was forced to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss.

43.     SPS's "first" binder of the hazard insurance dated December 16, 2013 in the amount of $1,539.00 that covers past 56 days clearly demonstrated that SPS charged for retroactive hazard insurance on the Izmirligil's home. A copy of this binder is annexed hereto as **Exhibit "3"**.

44.     Izmirligil's voluntary insurance coverage contained a "Standard Mortgagee Clause" and a "Lender's Loss Payable Endorsement" which provides coverage for the lender even after the insured has failed to pay premiums and/or policy reaches the expiration date. Accordingly, force-placing insurance policies effective immediately without even termination of Izmirligil's policy and charging Izmirligil expensive and unnecessary premiums for such insurance is additionally unlawful and unfair because Izmirligil is charged for needless and

duplicative insurance coverage. The force-placed policy issued by Assurant and ASIC pursuant to and in accordance with the scheme described herein thus generated improper windfalls to Defendants at the expense of the Izmirligil with whom Assurant and ASIC have no contractual relationship. The sole justification for the tactics described above is the unjust enrichment of Defendants, including those insurance providers with whom Izmirligil has no contractual relationship, as well as, the Defendants providing tracking and "producing" services with whom Izmirligil also has no direct contractual relationship.

Defendants' Force-placed Insurance on Izmirligil's Property, Securitization and Servicing of Izmirligil's Loan by SPS

45.   On or about July 26, 2006, Izmirligil financed a mortgage loan from J.P. Morgan Chase Bank, NA (the "Izmirligil Mortgage") secured by his home in Miller Place, NY (the "Izmirligil property"). The amount of the loan was $1.1 million. The Izmirligil Mortgage was supposed to be an interest and principal payment mortgage loan, however, it was originated by JPMCB with forged underwriting documents, as an "Interest Only loan" which was a "non-traditional loan" (hereinafter referred to as "the loan origination fraud").

46.   Additionally, the Bank's own documents clearly demonstrate the "Double-booking fraud" and/or "Double-funding fraud" and "Residential Mortgage-Asset Backed Securities (RMBS) fraud" committed by the Banks, including, among others, JP. Morgan Chase Bank, NA ("loan originator", "first servicer", and currently "paying agent" of the same trust), Chase Home Finance, LLC ("sponsor" of the trust), and The Bank of New York Mellon (the "trustee" of the same Trust CMFT 2006-S2 Series).

47.   The above-named Banks engaged in a scheme known as double-booking fraud (the "Double-funding fraud").

48.   First, JPMCB, as a loan originator, sent simultaneous funding requests for the

same loan to two different warehouse lenders, here CHF and BONYM. JPMCB disbursed the money from one lender to Izmirligil, while directing the title company to wire the money received from the other lender to its bank account. Second; JPMCB then executed duplicate original promissory notes and retained the entire value of the loan for its own purposes (the "double-booking fraud").

49.     While, most residential mortgages in the United States are financed through securitization, which is a financing method involving the issuance of a security backed by a dedicated cash flow stream such as mortgage payments, here, JPMCB's (as first servicer) and/or CHF's (as sponsor) retained the entire value of the mortgage loan for its own purposes.

50.     This was done instead of utilizing the proper pooling, chain of title and securitization process. As such, this clearly constituted RMBS fraud, where JPMCB signed a $13 billion settlement agreement concerning its RMBS related and other conduct, with, among others, the Federal/State entities and BONYM and that also Izmirligil's Mortgage Loan was one allegedly included into one of the involved Securitized Trust's pool of loans.

51.     After the origination of Izmirligil's disputed loan and after assembling a pool of mortgage loans, another financial institution, here, CHF (the "sponsor" or "seller"), was required to sell the same loans of the same pools to the Depositor, here, Chase Mortgage Finance Corporation ("CMFC" or "Depositor"), and then, the Depositor CMFC was required to resell the same loans to the passive, specially created, special-purpose vehicle ("SPV"), typically a trustee, here, The Bank of New York Mellon (the "BONYM") of a Trust, here CMFT 2006-S2 series. However, that proper securitization process was not followed and was never contemplated nor finalized. The $13 billion settlement agreement strongly suggests and clearly demonstrates the Banks' RMBS fraud, committed by the above-named Banks, and relating to

Izmirligil's mortgage. See www.justice.gov/justice-department-federal-and-state-partners-secure-13-billion-settlement.

52.     A variety of reasons, e.g., pass-through tax status ("REMIC"), mandate that SPV be passive. It is little more than a shell to hold the loans and put them beyond the reach of the creditors of the financial institution. Here, the originator/servicer JPMCB and/or the sponsor CHF's retained the entire value of the mortgage loan for their own purposes and failed to go through the proper chain of title with respect to the RMBS, of which the Izmirligil Mortgage was a part. This constitutes RMBS fraud and the Banks are currently required to pay $4.5 billion to BONYM as trustee, and also requires $4 billion relief to the victims of RMBS fraud, such as Izmirligil (the "RMBS fraud").

53.     On or around November 1, 2013, SPS became a "mandatory sub-servicer" of the Trust, servicing, among others, Izmirligil's disputed mortgage loan, replacing the first servicer JPMCB, pursuant to the $13 billion RMBS "Trust Settlement Agreement" and based upon its "Subservicing Protocol", attached to the Settlement Agreements as Exhibit-B (the "Subservicing Protocol").

54.     The "Authorized Sub-servicers" under this Subservicing Protocol are Select Portfolio Servicing, Inc (SPS); Specialized Loan Servicing, LLC (SLS); Resurgent Mortgage Servicing (Resurgent); Residential Credit Solutions, Inc (RCS); and Selene Finance, LP (Selene). (See, Subservicing Protocol at page-2).

55.     Each sub-servicer contract provides for a base servicing fee of $1,015.00 per year for each Delinquent Subserviced Loan, including Delinquent Subserviced Loan subserviced by SPS as of the agreement date, and $250.00 for any current subserviced loan, including any current subserviced loans subserviced by SPS as of the agreement date.

56.     Additionally, each approved sub-servicer, including SPS, is entitled to receive

"Compensation Structure Incentives" for short sale resolutions and foreclosure outbid sales, etc., based on the SPS's "Benchmark Reporting" and JPMCB's "Performance Reviewer". (See, Subservicing Protocol at page 4-9).

57.    This compensation structure incentivizes the servicers, including SPS to artificially and improperly inflate its expenses and fees. As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was simply never done. Servicers, including SPS also engage in a variety of abusive practices, where, as here, force-placing insurance when not required. See generally Adam Levitin & Tara Twomey, Mortgage Servicing, 28 Yale J. on Reg. 1, 76 (2010); Robo-Signing, Chain of Title, Loss Mitigation, and Other in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Lewitin, Geo. U. L. Center), or, as in this case, force-placing insurance that is fraudulently created, absolutely unnecessary and fraudulently inflated in price.

58.    Servicers' compensation structure also incentivizes them to delay foreclosures, where, as here, since 2009, The 2009 Foreclosure Action has persisted for more than eight (8) years. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses.

59.    In The 2009 Foreclosure Case, SPS demanded $2.2 million, as per its November 1, 2017 statement. Through its strategy, sub-servicer SPS, disregarded its contractual duty based upon the Plaintiff's mortgage agreement, and instead simply kept ramping up the fraudulent charges as to Izmirligil's disputed loan until it hit the "sweet spot" where the amount owed to the servicer is equal to the liquidation value. At that point, because there is no equity left to strip, SPS just wants to dump the property from its portfolio as quickly as it can. SPS, as sub-

servicer of Izmirligil's loan, dragged out the alleged default for the purpose of piling up bogus

and fraudulently inflated fees and expenses, where Izmirligil was not even in default on or

around April 1, 2009, and where Izmirligil was not served a proper RPAPL §§1303 and 1304

notices and/or 30-day default notice—until there is no value left in the Izmirligil's property.

60.     SPS's and JPMCB's own "Escrow Transaction History" records clearly reflect

that the balance of the Izmirligil's escrow account was $1,646.30 as a "surplus" on July 21,

2009.

61.     However, CHF's letter titled "Notice of Intent to Foreclosure" (Acceleration

warning) demanded $33,117.38, allegedly "past due" as of July 21, 2009, within 30-days by

stating that Izmirligil defaulted in payment since April 1, 2009.

62.     In contrast, Izmirligil made additional payments after April 1, 2009; in the

amount of $10,458.32 on April 4, 2009; in the amount of $10,458.32 on May 14, 2009; and in

the amount of $10,453.59 on July 21, 2009, totaling $31,370.23 and further Izmirligil's half of

the property tax was paid in the amount of $15,601.16 on May 11, 2009 and his escrow account

balance was still "surplus" in the amount of $1,646.30, as per the SPS defendant's and Chase's

"Escrow Transaction History" records. A copy of the Escrow Transaction History is annexed

hereto as **Exhibit "9"**.

63.     Furthermore, CHF's alleged "Notice of Default" which was allegedly sent to

Izmirligil dated July 22, 2009, did not comply with the requirements of Izmirligil's mortgage

and note agreement based on its clear language at paragraphs "18" and "22".

64.     This is because CHF was not the lender or the servicer of Izmirligil's mortgage

loan and was not authorized to send such a Notice of Default under the note and mortgage

agreements, and, also because CHF's letter merely requests the alleged three (3) past due

21

payments in the amount of $33,117.38, not the "full amount of the Izmirligil's alleged mortgage loan debt." A copy of the alleged Notice of Intent to Foreclose is attached hereto as **Exhibit "10"**.

65.     A "Notice of Intent to Foreclose" is nothing more than a "letter" discussing acceleration as a possible future event which does not constitute an exercise of the mortgagee's optional acceleration clause under the mortgage and Note agreements that does not comply with "30-day Notice of Default" by "not" demanding the entire mortgage debt within 30-days.

66.     Thus, SPS, through its deponents Diane Weinberger and KaJay Williams, have misrepresented, expressly, the default and amount due against Izmirligil who was not even in default on or around April 1, 2009 and/or July 21, 2009, by fabricating an "artificial" default date and by further failing to apply all amounts accepted in connection with a loan against interest and principal due. This fact is borne out by the Payment History Records. It is clear that SPS failed to review the Escrow Transaction History records pertaining to Izmirligil's loan to verify whether Izmirligil had failed to make three (3) full monthly payments and/or Izmirligil was in default in payment on April 1, 2009.

67.     The conduct of SPS described above was not contemplated in or authorized by Izmirligil's mortgage agreement, specifically at paragraphs "2", "3(b), (c)", "5"; and "18"; and thus, are a breach of contract by SPS based on the plain language of the contract. A copy of the mortgage is annexed hereto as **Exhibit "17"**.

68.     Further, SPS's own evidence, including an "Escrow Transaction History", from July 26, 2006 to December 1, 2015 for Izmirligil's mortgage loan No: 1760516313, prepared by the previous servicer JPMCB, clearly establishes that, Izmirligil was not in fact in default in payment on or around April 1, 2009, at the time of the commencement of The 2009 Foreclosure Action by BONYM. SPS is now the sub-servicer of JPMCB and servicing Izmirligil's mortgage

loan since November 1, 2013, as an assignee and/or predecessor which is obligated to correct the discrepancies of the Escrow Transaction records or will be responsible for any misconduct of its assignor JPMCB as an assignee who stands in the shoes of the assignor.

69.     Izmirligil always had his own hazard insurance policy, since July 26, 2006 and paid in full from the same Escrow account on 7/18/2007, in the amount of $3,935.63; on 7/16/2008, in the amount of $4,117.00; on 7/22/2009, in the amount of $3,918.00; on 7/7/2010, in the amount of $2,669.00; on 7/5/2011, in the amount of $2,768.37; on 7/24/2012, in the amount of $2,643.57; on 7/23/2013, in the amount of $2,872.50; on 7/14/2014, in the amount of $2,872.00; on 7/6/2015, in the amount of $2,871.97; on 7/26/2016, in the amount of $2,871.97; on 6/21/2017, in the amount of $2,871.70, as clearly demonstrated on the Escrow Transaction History records.

70.     SPS could have easily verified the same fact and/or should have verified that Izmirligil had always had his own effective hazard insurance since July 26, 2006 to present.

71.     Thus, the SPS's force-placing unauthorized insurance on Izmirligil's property is clearly a breach of contract that was not also contemplated in or authorized by Izmirligil's mortgage contract. A copy of the effective insurance policies from 2006 to 2017 are annexed hereto as **Exhibit "7".**

72.     SPS defendant's incessant prosecution of The 2009 Foreclosure Action since 2013; sending its employee Diane Weinberger as a deponent to testify deceitfully under oath during a Referee's hearing subsequent to the "first " order of reference which was vacated by the Second Department, and further, still fabricating fraudulent affidavits of merit—persistently— signed by same deponents of SPS, Diane Weinberger and Kajay Williams, under oath for its "second" order of reference dated February 2, 2017; constitutes unconscionable conduct, in

addition to SPS's "Hazard Insurance Scheme" that already caused, and still causes damage to the Izmirligil's property, caused Izmirligil to incur more than $300,000.00 in attorney's fees and costs, along with SPS's force-placed insurance charges to Izmirligil's escrow account in the amount of $30,096.00 that was never credited or refunded properly, by SPS.

73.     SPS's abusive servicer activities such as delaying foreclosures, charging junk fees, and fraudulently originated and inflated force-placed insurance policies have enabled SPS to strip millions of dollars in equity from the consumers' homes, at the expense of homeowners, including Izmirligil, and the investors in the mortgages and RMBS. It has also exacerbated the housing crisis by pushing consumers prematurely or unnecessarily into foreclosure, where, as here, neither current sub-servicer SPS, nor the previous servicer JPMCB could logically explain Izmirligil's missing or unapplied payments of more than $51,000.00 as per their own "Escrow" accounting records and "Detailed Payment History" records (the "first servicing fraud" and the "second servicing fraud").


The Kickback Scheme and/or Bribery Scheme

74.     The Kickback or Bribery Scheme in this case is similar to that conducted by the exact same defendants in Juan Almanzar v. Select Portfolio Servicing, Inc; Assurant Inc; American Security Insurance Company; and Standard Guaranty Insurance Company; Case No: 14-cv-22586 (MORENO, J) (S.D. Florida), a class action that settled in the amount of $40.6 million of monetary relief to 166,006-member settlement class and $4.15 million in attorney fees and expenses. Izmirligil was also a class-member, but opted-out within a time-period given by the District Judge Moreno.

75.     Additionally, in Lisa C. Engelhardt, John Clarizia, Gerald Coulthurst, Enrique

24

Dominguez v. Assurant Inc; American Security Insurance Company; Ocwen Financial Corp; Ocwen Loan Servicing, LLC; Case No: 13-cv-2007 (S.D New York) (ALC-HBP), Izmirligil's kickback or bribery scheme allegations are similar to that conducted by Assurant and ASIC, another class action against Assurant and ASIC that settled in 2014.

76.     In the Almanzar case, more than eight (8) class-members, including Plaintiff Almanzar and in the Engelhardt case, every class member, including Plaintiffs Engelhardt, Clarizia, Coulthurst, and Dominguez, had voluntary insurance coverage when the same defendants fraudulently had lapsed and fraudulently force-placed high cost hazard insurance coverages on the Plaintiffs' homes within last ten (10) years.

77.     In the Almanzar case, defendant SPS allegedly extracted kickbacks and bribes from force-placed insurer Assurant defendants that paid to SPS, directly where the defendant parties allegedly agreed to fraudulently label the kickbacks as "commissions", according to settlement papers filed in the case.

78.     Nevertheless, SPS, ASIC and Assurant's conduct that fraudulently labeled the kickbacks as "commissions" are strictly forbidden by the Consent Order of the New York State Department of Financial Services, Fraud & Consumer Protection Division dated March 21, 2013, with the $14 million penalty against Assurant, Inc and against American Security Insurance Company (the "Assurant defendants"), as stated therein in part:

II.  Prohibited Practices

7. The New York FPI companies shall **not** pay **commissions** to a **servicer** or a person or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.

(See, Consent Order at page-9)


IV. Coverage Amount

16. The amount of coverage that the New York FPI companies force place on any homeowner shall **not exceed** the **last known amount** of coverage...

(See Consent Order at page-11)

VI. Restitution

19. "Eligible Claimant" is herein after defined to mean the following:
c. any New York homeowner who demonstrates that he or she has incurred actual out-of-pocket premium expenses as a result of one of the placements of force-placed insurance issued by ASIC on ABIC on New York properties after January 1, 2008, if either (i) acceptable continuous voluntary coverage was in effect and, despite the presentation of written confirmation thereof, ASIC or ABIC charged and did not subsequently credit back or refund force-placed insurance premiums, or (ii) ASIC or ABIC charged commercial force-placed insurance rates on a one-to-four family residence that should have been rated using residential force-placed insurance rates.

(See, Consent Order at page-13).

79.     It is apparent that NYSDFS's Consent Order has confirmed the allegations of this

complaint and is targeting the illicit arrangements alleged herein, against the same defendants.


Defendants Fraudulently Charged and Persistently Failed To Credit Back or Refund the Full Amount of Force-Placed Insurance Premiums on The Izmirligil's Property Even Though Proof that Other Coverage Was in Effect Was Provided

80.     Izmirligil's mortgage agreement is typical. Paragraph 5 of the mortgage

agreement, provides as follows:

5. **Borrower's obligation to maintain Hazard Insurance or Property Insurance:**

I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the property. If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's opinion and my expense.

A copy of the excerpt of the Mortgage is annexed hereto as **Exhibit "8"**.

81.     Izmirligil had always had adequate hazard insurance on his property and did not

need force-placed insurance. Izmirligil presented a written confirmation to the Defendants of this fact, on or after November 1, 2013, by informing them with numerous certified return receipt mailings and also via fax. Izmirligil's letter advising Defendants of existing insurance coverage is annexed hereto as **Exhibit "5".**

82.     Most importantly, SPS, as sub-servicer of the first servicer of the Trust, JPMCB and acting on behalf of JPMCB, which had always had the copy of Izmirligil's hazard insurance that was obtained from Scottsdale Insurance, since July 26, 2006; or, alternatively, SPS should have checked the first servicer JPMCB's servicing records and/or with JPMCB itself that the servicing records demonstrated that Izmirligil's hazard insurance from Scottsdale Insurance was paid in full in the amount of $2,872.00 per annum since the year of 2006, to present. A copy of the 2013-2014 accounting record that shows the "dual" charges for Izmirligil's hazard insurance is annexed hereto as **Exhibit "6".**

83.     Specifically, Plaintiff, in his correspondence dated December 25, 2013 sent to the defendant SPS and defendant ASIC, enclosed with the previous SPS letter and ASIC letter; enclosed with the copy of the Declaration page of Izmirligil's current Hazard Insurance policy and a Cease and Desist letter, stated that:

(a) …and I declare that I have the Homeowners policy ("Hazard Insurance") for the residence premises located at 15 Sailors Court, Miller Place, New York, 11764. The policy period starts from July 26, 2013 to July 26, 2014.

(b) JP. Morgan Chase Bank, NA as alleged servicer of the subject loan, has all the necessary information in regard to my Hazard Insurance and required "Mortgage Clause" on my policy...

(c) Any attempt "to buy insurance" or "to issue coverage" without "My authorization" on behalf of me for my residence, will be a violation of my legal rights and will be subject to a Court action.... See **Exhibit "5"**.

84.     On or about December 21, 2015, Izmirligil received a letter from Claims

Administrator, C/O Rust Consulting, Inc., Faribault, Minnesota 55021-9140, in regard to the

class-action titled Juan Almanzar, et al. v. Select Portfolio Servicing, Inc., et al, Case No: 14-cv-

22586-Moreno; United States District Court for the Southern District of Florida, informing that:

> "If you were charged by SPS for lender placed insurance issued by American Security
> Insurance Company ("ASIC"), Voyager Indemnity Insurance Company ("VIC"), or
> Standard Guaranty Insurance Company ("SGIC") (collectively "the Assurant
> Defendants"), or another insurer for your Residential property, this settlement will
> provide you with an opportunity to either: (i) claim a cash award, if you paid all or a
> portion of the premiums for that LPI policy to SPS during the class period; or (ii) claim a
> credit towards what you currently owe SPS, if you did not pay but still owe the premiums
> for that LPI policy to SPS during the class period in that the class period begins on July
> 11, 2010 and ends on October 15, 2015."

A copy of this Letter is annexed hereto as **Exhibit "12"**

85.     On December 27, 2015, a week later he had received the class action letter from

the Claims Administrator, C/O Rust Consulting, Inc., Izmirligil sent "QWR Letter" to SPS and

ASIC requesting information concerning whether SPS had obtained the LFI and/or LPI policy,

on or around November 1, 2013 from ASIC and/or from any other LFI insurer for Izmirligil's

property between the years of 11/1/2013-11/1/2014-11/1/2015; and also demanded a copy of the

Detailed Payment History demonstrating the servicing activity from the inception of the above

alleged loan from July 26,2006 to present. A copy of this QWR is annexed as **Exhibit "14".**

86.     On January 27, 2016, attorney Dorothy A. Davis of Eckert Seamans, LLC. sent a

letter to the law firm of David L. Singer who was not the attorney of the record in The 2009

Foreclosure Action at the time, concerning the LFI policy and concerning the QWR of Izmirligil

and misstated the facts in that correspondence stating:

> "According to SPS' records, LPI was placed on the property, with a policy number of
> ALR 07556724339, effective November 1, 2013 to November 1, 2014 ("LPI
> Policy") ...However, it appears your client subsequently obtained a retail policy on the
> property, and as a result, SPS terminated the LPI Policy. Since the termination of the LPI
> policy in July of 2014, we understand no additional LPI has been placed on the property
> and currently the property is insured by Scottsdale Insurance Company, pursuant to

Policy Number HOS 1207787, effective July 25, 2015, through July 26, 2016 ("Scottsdale Policy") ...

A copy of this response letter is annexed hereto as **Exhibit "15".**

87.     In reality, Izmirligil had his hazard insurance policy since July 26, 2006 and that never lapsed on or after July 26, 2013, and/or around November 1, 2013 when the defendant SPS force-placed hazard insurance—deceitfully and fraudulently—on the Izmirligil's property on or around November 1, 2013 and after. A copy of Izmirligil's response is **Exhibit "16"**.

88.     Additionally, SPS also failed to provide a proper copy of its Payment History records that demonstrates its actual charges and credits including Izmirligil's payments totaling more than $51,000.00, which is still missing, to the extent that its Deponents, Diane Weinberger and Kajay Williams cannot possibly swear to it as the Court requires and/or as is mandated pursuant to AO/431/11.

## CLAIMS FOR RELIEF

### COUNT I

### BREACH OF CONTRACT
**(Against SPS)**

89.     Plaintiff repeats, reiterates and realleges all prior paragraphs of this Complaint as if fully set forth herein at length.

90.     SPS became a sub-servicer, instead of JPMCB, servicing Izmirligil's mortgage loan since November 1, 2013, as per its "Notice of Assignment". See **Exhibit "2"**.

91.     SPS has never been a party in any litigation concerning Izmirligil's related lawsuits.

92.     SPS is bound by the Izmirligil's mortgage loan agreements as servicer and assignee/successor of the servicing agreement of JPMCB, and as an escrow holder.

93.     Izmirligil's mortgage loan required the mortgagor to maintain hazard insurance on his property. Such contract "only" authorized the mortgagee or the servicer, here sub-servicer SPS, to force-place insurance should the mortgagor fail to do so or there be any lapse in the mortgagor's insurance coverage, but not if Izmirligil always had his current hazard insurance policy in effect since July 26, 2006 to present.

94.     Additionally, nothing in Izmirligil's mortgage loan contract authorizes or permits SPS to charge or bill Izmirligil for kickbacks, bribes, or to recoup from, or to be reimbursed by, Izmirligil with respect to kickbacks and bribes or costs that have been grossed-up or artificially inflated to include kickbacks and bribes. Nothing in Izmirligil's mortgage loan contract of authorizes or permits SPS to charge Izmirligil in excess of the actual cost of the insurance which is $2,872.00 per annum; rather, SPS charged $10,032.00 per annum on Izmirligil's property, per annum for the years of 2013, 2014, and 2015 when Izmirligil had his own hazard insurance policy that was effective since 7/26/2006, to present and has never lapsed.

95.     Further, Izmirligil's mortgage contract requires the sub-servicer SPS to apply all amounts accepted in connection with Izmirligil's loan against principal and interest due, and/or to credit all payments effective as of the date of receipt, amounts paid in connection with Izmirligil's loan where Izmirligil payments totaling more than $51,000.00 were never applied to his account as reflected in the Escrow Account Records and/or to the sub-servicer SPS's Detailed Payment History records.

96.     SPS is still responsible for reviewing its records pertaining Izmirligil's loan to verify whether Izmirligil had failed to make three full monthly payments on or around April 1, 2009, while it prosecutes The 2009 Foreclosure Action.

97.     As the servicer of Izmirligil's mortgage loan, SPS was bound by the terms of the

Izmirligil's mortgage loan contract with respect to its obligations as an escrow holder.

98.     Further, SPS is responsible from the conduct of its assignor, JPMCB, as assignee who is in the same shoes of JPMCB, as servicer.

99.     SPS breached and acted without any authority under Izmirligil's mortgage loan contract by charging Izmirligil for a redundant and unnecessary hazard insurance policy, including bribes and kickbacks, that was artificially lapsed and artificially inflated and fraudulently incorporated into force-placed insurance charges.

100.    SPS's fraudulent conduct was not authorized and was in breach of the terms of Izmirligil's mortgage contract.

101.    SPS has thus breached its contract with Izmirligil based on the clear language at of the mortgage loan agreement at paragraphs "2", "3(b), (c)", "5" and "18".

102.    As a direct, proximate, and legal result of the aforementioned breach of contract by SPS, Izmirligil has suffered—and still suffers damages.

103.    Wherefore, Plaintiff Izmirligil seeks compensatory damages resulting from SPS's breach of contract, as well as injunctive relief preventing SPS from further violating the terms of Izmirligil's mortgage contract. Plaintiff further seeks all relief deemed appropriate by this Court, including attorney's fees and costs.

## COUNT-II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against SPS)

104.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

105.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common Law

calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

106.   Pursuant to the implied covenant of good faith and fair dealing, SPS is obligated to perform its duties under the mortgage loan contract in good faith and to deal fairly with Izmirligil, where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

107.   Plaintiff's mortgage contract allows SPS to force-place insurance coverage on the Plaintiff's property, "only" in the event of a lapse in coverage and SPS is afforded substantial discretion in force-placing insurance coverage.

108.    SPS is permitted to unilaterally decide whether Izmirligil has lapsed his hazard insurance coverage and is permitted to unilaterally choose the company from which it purchases force-placed insurance and to negotiate any price for the coverage it procures.

109.   However, SPS is not entitled to procure a force-placed insurance policy when a valid policy is already in effect. Finally, SPS is afforded substantial discretion in crediting or refunding the full amount of the hazard insurance cost that it charged Izmirligil back to the Izmirligil's Escrow Account and or Izmirligil's payment records after SPS was informed by Izmirligil that he has never lapsed his hazard insurance coverage. Moreover, SPS should have known that Izmirligil had always has his coverage reflected on its own Escrow account records and/or Payment History records or JPMCB's insurance records.

110.   Plaintiff's mortgage contract also allows SPS substantial discretion to accept Izmirligil's mortgage payments and to credit properly to the Izmirligil's Escrow account where SPS is also permitted to unilaterally decide whether Izmirligil was in default in his payments on

or around April 1, 2009, and whether Izmirligil was served a 30-day "Default Notice" under the mortgage contract.

111.     However, the question of what happened to Izmirligil's missing payments of more than $51,000.00 still remains unanswered and SPS is obligated to correct the wrongful conduct of the first servicer, JPMCB, under which SPS is the sub-servicer of JPMCB, by taking the proper steps and proceedings, immediately, under the mortgage contract, to ensure that the SPS exercises its discretion in good faith.

112.     First servicer JPMCB did not accept Izmirligil's payments after June 21, 2009, due to the account being marked for refinancing or modification and never sent any statements after June 2009. A copy of the Customer Communications Worksheet is annexed as **Exhibit "11".**

113.     In all of its actions described herein, SPS acted on its behalf and as the duly authorized agent of the BONYM or assignee of the Izmirligil's mortgage agreements, and as an escrow holder.

114.     Izmirligil's mortgage contract contained an implied covenant of good faith and fair dealing, pursuant to which the SPS was bound to exercise the discretion afforded it in good faith and to deal fairly with Plaintiff in that regard. SPS is not allowed to evade the spirit of the mortgage contract by exercising discretion afforded it under the mortgage to force-place insurance when that is wholly unnecessary as part of its own scheme or to keep Escrow Accounting records in an inaccurate manner all to Izmirligil's detriment.

115.     Any discretionary authority granted to the SPS under the terms of Izmirligil's mortgage contract was subject to t SPS defendant's implied duty of good faith and fair dealing. Accordingly, to the extent that the mortgage contract of Plaintiff permitted SPS to unilaterally

"force-place" insurance, and/or to unilaterally "keep the records" of the Escrow Account and mortgage account in general, SPS was obligated not to exercise its discretion in bad faith for its own financial gain for the purposes of maximizing profits as part of a scheme, at Izmirligil's expense.

116.    SPS breached its duty of good faith and fair dealing in at least the following respects, among others: By failing to hold, manage and control Izmirligil's escrow funds in good faith and fairly in trust, and by mismanaging Izmirligil's escrow funds unilaterally with respect to the handling of such funds; SPS was obligated in the maintenance of Izmirligil's escrow account by the highest duty and responsibility and SPS defendant failed to do so.

117.    Paragraph "2" and paragraph "3(b) and (c)" of the Izmirligil's mortgage loan contract between lender or its servicer SPS, "unambiguously" directs the lender or its servicer SPS, regarding the "Application of Izmirligil's payments and insurance proceeds" and such activity must be done with fairly and in good faith.

118.    However, the SPS's own Payment History records ("KLT" "Key Loan Transfer") and JPMCB's own "Detailed Payment Transaction" records clearly demonstrate that SPS and its predecessor servicers misapplied or did not properly account for the payments made by Izmirligil and therefore erroneously declared him to be in default.

119.    Izmirligil's first mortgage payment dated 9/1/2006, in the amount of $9,937.01 ("first mortgage payment"). Izmirligil's advance escrow payment dated 7/26/2006, in the amount of $9,743.38 ("advance escrow payment") and Izmirligil's further payments made on April 4, 2009, in the amount of $10,458.39; on May 14, 2009, in the amount of $10,458.32; on July 21, 2009, in the amount of $10,453.59, were made but not properly credited by SPS or its predecessor servicer, resulting in SPS t and JPMCB unlawfully declaring that Izmirligil was in

default on April 1, 2009 and further, unlawfully asserting that Izmirligil never made any

payment after April 1, 2009, in which the amount of the payment discrepancies is $51,050.62

that was clearly unapplied to the Izmirligil's account as per the various payment history records.

120.    Still, SPS continued to prosecute The 2009 Foreclosure Action, and to submit

sworn testimony and documents to the Court without addressing this glaring error.

121.    Thus, SPS's conduct as described above is a breach of implied covenant of good

faith and fair dealings under the Izmirligil's mortgage loan contract at paragraphs "2 and 3(b),

(c)".

122.    Moreover, paragraph "18" of the Izmirligil's mortgage loan contract

"unambiguously" directs to lender or its servicer SPS, in regard to sending the "30-day Notice

of Default" to Izmirligil, if the lender or SPS requires the payment in "full" when Izmirligil was

declared in default in payment on April 1, 2009.

123.    A "Notice of Default" dated June 22, 2009, was allegedly sent by CHF who was

not the party, nor the plaintiff/lender nor the servicer of the loan and was not authorized to send

such a notice. This notice was not the notice required by the mortgage contract but rather just a

letter discussing acceleration as a possible future event and does not constitute an exercise of

the mortgagee's optional acceleration clause. Even so, SPS t unlawfully and persistently

demands the alleged amount due in "full" from Izmirligil on February 2, 2017, that is

inconsistent with Izmirligil's contract provision at Paragraph 18.

124.    Thus, SPS's above-conduct is a breach of the implied covenant of good faith and

fair dealing under the Izmirligil's mortgage loan contract.

125.    Paragraph "5" of the Izmirligil's mortgage loan contract between lender or its

servicer SPS, "unambiguously" directs the lender or its servicer SPS, to maintain "Hazard

Insurance", "only" if/when Izmirligil fails to obtain hazard or property insurance on his home.

126.   However, SPS's unlawful practice of force-placing hazard insurance on Izmirligil's property despite the fact that he always had his own hazard insurance policy since July 26, 2006 to present, and that he had evidenced it with his written communications, numerous times to SPS. ASIC and Assurant, where SPS had never credited the amounts charged back to the Izmirligil's escrow account.

127.    Thus, SPS above-conduct is breach of the implied covenant of good faith and faith dealing under the Izmirligil's mortgage loan contract.

128.   SPS additionally breached its duty of good faith and fair by failing to make any effort whatsoever to maintain Izmirligil's existing insurance policy as reflected on its escrow accounting records and, instead—for the sole purpose of maximizing its own profits—forcing Izmirligil to pay for hazard insurance policy from the insurer of the SPS defendant's choice, namely the ASIC and Assurant defendants. This policy needlessly came with substantially greater premium, in the amount of $10,032.00 per annum and less coverage than Izmirligil's existing policy, in the amount of $2,872.50, while providing an improper financial benefit to the SPS defendant and/or its affiliates, pursuant to their scheme

129.   SPS improperly used its discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations by purposefully forcing Izmirligil to pay for more than the cost of protecting the lender's interest in the secured property.

130.   SPS failed to seek competitively priced insurance on the open market and instead selected force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies were continually purchased through the same companies, e.g., ASIC,

Assurant, etc., as part their mutual illegal scheme.

131.    SPS assessed unnecessary, excessive and "artificially inflated" insurance policy premiums against Izmirligil's account and misrepresented the reason for it as well as the policy's cost.

132.    SPS backdated a force-placed insurance policy on Izmirligil's property to cover time periods of fifty-six (56) days between November 1, 2013 and December 26, 2013, in the amount of $1,539.00, which had already passed, and for which there was already absolutely no risk of loss, where Izmirligil had already had his own effective policy on his property.

133.    SPS misrepresented in its force-placed insurance notice, that Izmirligil was not obligated to pay for backdated insurance coverage for the fifty-six (56) day period between November 1, 2013 and December 26, 2013, during which the lender or servicer SPS had no risk of loss, due to the passing of time and/or the lender's/servicer's coverage under a "standard mortgagee clause" and/or a Lender's/servicer's Loss Payable Endorsement.

134.    SPS procured force-placed insurance policy on Izmirligil's property to cover the time period during which the mortgage was already covered pursuant to a Lender's/servicer's Loss Payable Endorsement.

135.    SPS, ASIC, and Assurant failed to cancel its policy and to refund or credit its cost, properly, in the full amount back to the Izmirligil's escrow account while undertaking a scheme that was strictly prohibited by the Consent Order of NYDFS dated March 21, 2013.

136.    Nonetheless, SPS has imposed charges that exceeded the amounts required to protect the mortgagee's interest in the policy—unnecessarily—where Izmirligil had already had his own policy which was protecting the mortgagee's interest based on Izmirligil's mortgage loan contract at paragraph "5".

137.     It is abundantly clear that, by fraudulently force-placing insurance that goes well beyond the pale of what is required to protect its interest, SPS breached its express contractual obligations owed to Izmirligil as well as the implied duty of good faith and fair dealing.

138.     As direct and proximate result of SPS's breach of the implied covenant of good faith and fair dealing and the express terms of Izmirligil's mortgage contract, as described above, Izmirligil has suffered damages and is entitled to the relief sought herein.

## COUNT III

## BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION OF FUNDS HELD IN TRUST
### (Against SPS)

139.     Plaintiff repeats, reiterates and realleges all of the allegations set forth in all of the prior paragraphs of this complaint as if fully set forth herein at length.

140.     As a servicer, SPS holds and controls escrow funds on behalf of Izmirligil, whose mortgage it services; controls the establishment, funding requirements and maintenance of escrow accounts for the purposes of taxes, assessments, insurance premiums, homeowner's association fees and other items set forth in the Izmirligil's mortgage contract as they came due; and is obligated under the mortgage loan agreement to return any excess funds in accordance with the terms of the Izmirligil's mortgage.

141.     SPS, as servicer of Izmirligil's mortgage loan, has required payment of and/or accepted money from Izmirligil for Escrow items identified in his mortgage on a monthly basis and held them in Plaintiff's escrow account. Similarly, SPS, as the servicer, was in a position to force-place hazard insurance, if/when Izmirligil's own hazard insurance lapsed, requiring payment therefor, and deducting and/or charging the cost of the premiums to Izmirligil's escrow account.

142.    SPS was and still is obligated to hold, manage, and control these escrow funds in trust, and owed Izmirligil the highest fiduciary duty with respect to the handling of such funds.

143.    SPS is in a fiduciary relationship with Izmirligil, because SPS received and still receives a greater economic benefit from these transactions than it would from a typical escrow transaction. Specifically, the debtor-creditor relationship transferred into a fiduciary relationship when SPS took it upon itself to manage Izmirligil's escrow account and then withdrew money from Izmirligil's escrow account to pay force-placed insurance premiums "fraudulently", even when Izmirligil's own hazard insurance policy had never lapsed and which policy had always been effective since July 26, 2006 to present.

144.    Additionally, SPS violated its fiduciary duties when it arranged to receive unlawful and unearned kickbacks or other commissions under the bribery/kickback scheme, which is totally fraudulent and clearly a greater economic benefit to it than what was contemplated under Izmirligil's mortgage contract.

145.    SPS breached its fiduciary duty to Izmirligil, by among other things: (a) unilaterally using escrow funds to purchase force-placed insurance at a cost and in amounts that was "artificially lapsed" and "artificially inflated" solely in order to generate additional profits for itself, where Izmirligil had always had his own hazard insurance policy since July 26, 2006 to present that was never lapsed; (b) profiting from unnecessary, duplicative and excessive force-placed insurance policies that were created fraudulently and purchased fraudulently from the Izmirligil's escrow fund at his expense; (c) unilaterally utilizing Izmirligil's escrow funds to pay for unnecessary and duplicative hazard insurance that was fraudulently originated for the purpose of increasing the SPS's profits; (d) improperly depleting Izmirligil's escrow funds for duplicative, unnecessary and unauthorized hazard insurance that was fraudulently fabricated and

39

further resulting in additional costs and economic injury to Izmirligil; and (e) unilaterally

utilizing Izmirligil's escrow funds to pay the attorney's fees and costs of the SPS who is still

prosecuting The 2009 Foreclosure Action against Izmirligil, despite the fact that he was not

even in default in payment on or around April 1, 2009, as per the SPS's own escrow account and

other records that clearly demonstrates a "surplus", in the amount of $11,152.64 on April 4,

2009; (f) profiting from an unwarranted foreclosure since November 1, 2013 that was

commenced with "forged" mortgage instruments fabricated by the lender's first attorney, now

defunct law firm of Steven J. Baum, P.C., in reaping extravagant and outrageous fees,

fraudulently from Izmirligil's escrow fund at Izmirligil's expense; and (g) improperly depleting

Izmirligil's escrow funds for the unlawful and unwarranted 2009 Foreclosure Action, despite

Izmirligil's multiple requests since November 1, 2013, to answer and correct the same disputed

issues as raised with QWR letters, but, instead persistently and intentionally failing to resolve

these issues for the purpose of increasing SPS's illegal profits, resulting in additional costs and

injury to Izmirligil.

146.   These actions were undertaken by SPS in bad faith solely for its own benefit and

were not intended to benefit Izmirligil.

147.   As a direct result of SPS's actions and subversion of Izmirligil's interests to the

defendant's own interests in reaping additional, extravagant and unauthorized fees and illegal

profits, Izmirligil has suffered and still suffers injuries in the form of unnecessary and fraudulent

excessive escrow charges, unlawful and improper depletion of escrow funds intended for and

properly allocated to other escrow items, a loss of funds from his escrow account and loss of

equity in his property due to the increases in the amounts due under the mortgage contract to

cover escrow shortfalls.

148.    Izmirligil is entitled to be compensated for all damages resulting from SPS's breach of its fiduciary obligations and misappropriation of escrow funds. In addition, Plaintiff Izmirligil is entitled to punitive damages because the SPS acted in bad faith—and still acts in deliberate or reckless disregard of his rights and SPS's obligation to hold his escrow funds in trust.

## COUNT IV

### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
### (Against the ASIC and Assurant)

149.    Plaintiff repeats, reiterates and realleges all of the allegations set forth in all prior paragraphs of this complaint as if fully set forth herein at length. This count is pled against ASIC and Assurant, referred to as "Assurant defendants".

150.    SPS breached its fiduciary duty to Izmirligil as set forth herein above.

151.    Assurant defendants actively induced and/or participated in SPS's breach of fiduciary duty through the conduct described herein above, including but not limited to, offering SPS the opportunity to reap additional profits and facilitating the realization of such profits through a scheme to force-place insurance on Izmirligil's property on a loan serviced by SPS as described above.

152.    Assurant and ASIC actively induced and/or participated in the SPS's breach of fiduciary duty through the provision of tracking services that wrongly identified and fraudulently implemented the force-placement of fraudulent, duplicative, unnecessary, unauthorized and exorbitantly priced hazard insurance on Izmirligil's property and facilitated the billing and payment for such insurance.

153.    As a result of the breach of fiduciary duty to Izmirligil by SPS, that the Assurant defendants induced and/or participated in as herein above described, Plaintiff suffered damages

in the form of fraudulent, unnecessary, unauthorized, and excessive escrow charges; unlawful and improper depletion of escrow funds intended for and properly allocated to other escrow items; a loss of funds from the Izmirligil's escrow accounts, and loss of equity in the property due to increases in the amounts due under the mortgage contract to cover escrow shortfalls.

154.    Izmirligil is entitled to all damages resulting from the SPS 's breach of its fiduciary obligations and misappropriation of escrow funds and the Assurant defendants are liable for these damages by virtue of their fraudulent conduct in aiding and abetting SPS's fraudulent and wrongful conduct.

**COUNT-V**
**COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT**
**(Against ASIC and Assurant)**

155.    Plaintiff repeats, reiterates, and realleges all of the allegations set forth in all prior paragraphs of this complaint as if fully set forth herein at length. This count is pled against ASIC and Assurant.

156.    Izmirligil conferred a substantial benefit upon ASIC and Assurant derived from the force-placed insurance premiums paid by Izmirligil. These benefits came at the Izmirligil's expense.

157.    The circumstances are such that in equity and good conscience restitution should be made by ASIC and Assurant to Izmirligil.

158.    By, among other things, providing fraudulent, duplicative, unauthorized, unnecessary and exorbitantly priced FPI policies on Izmirligil's property pursuant to their exclusive contract with SPS, and by backdating policies, the ASIC and Assurant were able to collect substantial premiums for fraudulent, duplicative, unauthorized, unnecessary and unusable property insurance coverage. ASIC and Assurant were unjustly enriched by these

43

practices.

159.    These payments were accepted and retained by ASIC and Assurant under circumstances such that it would be inequitable for them to retain the benefit they receipt without repayment to Izmirligil.

160.    As a result of the ASIC and Assurant's unjust enrichment, Izmirligil sustained damages in an amount to be determined at trial and seeks full disgorgement and restitution of the ASIC and Assurant's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful, wrongful, and fraudulent conduct alleged above.

161.    Further, Plaintiff Izmirligil seeks restitution and disgorgement of profits realized by the ASIC and Assurant as a result of their fraudulent, unlawful, unfair and/or deceptive practices.

## COUNT-VI

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C §§1961 et seq
### (Against All Defendants)

162.    Plaintiff repeats, reiterates and realleges the allegations set forth in all prior paragraphs of this complaint as if fully set forth herein at length. This count is pled against all defendants.

163.    Plaintiff and each defendant are "persons", as that term is defined in 18 U.S.C §§1961(3) and 1962(c). Plaintiff's RICO claim in this case is based on conduct similar to that engaged in by the exact same defendants; SPS; ASIC; and Assurant in Almanzar v. SPS; ASIC; Assurant; SGIC, Case No: 14-cv-22586 (S.D. Florida); where District Judge Moreno denied the same defendants' motions to dismiss, and the case settled for $44.75 million. Izmirligil is a class-member that opted out of this class-action lawsuit involving 166,006 class-members.

44

## The Enterprise

164.     For purposes of this claim, the RICO enterprise, is an association—in fact, as the term is defined in 18 U.S.C §§1961(4) and 1962(c), consisting of SPS, ASIC, and Assurant, including their respective officers, directors, employees, agents, and direct and indirect subsidiaries (the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

165.     The Enterprise was primarily managed by SPS which organized the fraudulent scheme and procured the involvement of ASIC and Assurant in it. ASIC and Assurant carried out their part of the scheme under the direction of SPS.

166.     The companies and individuals that constitute the Enterprise were associated for the common purpose of fraudulently force-placing and fraudulently inflating the stated premiums on force-placed insurance with respect to SPS—serviced loans where the consumers have always had their own hazard insurance, including Izmirligil since the inception of the mortgage loan, from July 26, 2006 to present. The purpose thereof was to induce homeowners to pay, and the servicer of the loan to incur, fraudulently created and fraudulently inflated charges in respect of such hazard insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate and foreign commerce. The proceeds of the Enterprise were distributed to its participants, principally to ASIC and directly and/or indirectly to Assurant.

167.     At all relevant times, the RICO defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C §1962(c).

168.    The members of the RICO enterprise had a common purpose: To increase and maximize their revenues by fraudulently forcing Plaintiff and other victims to pay fraudulently inflated—unreasonably high amounts for force-placed insurance through a scheme that inflated such charges to cover briberies, kickbacks, and expenses associated with monitoring SPS's entire loan portfolio, including Izmirligil's mortgage loan that is currently serviced by SPS since November 1, 2013. The RICO defendants shared the bounty of their enterprise, e.g., sharing the amounts charged to homeowners, including Izmirligil for force-placed insurance premiums generated by the joint scheme. Izmirligil had his own hazard insurance policy and paid the premium amount of $2,872.00 for the "better" coverage from "Scottsdale Insurance", per annum. However, the RICO defendants charged the amount of $10,032.00, per annum, for "lesser" coverage.

169.    The RICO enterprise functioned over a period of four (4) years, as a continuing unit, in this instant case, at least since November 1, 2013 and had maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

170.    SPS, ASIC, and Assurant conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than four (4) years, at minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate of foreign wire or mail facility for the purpose of executing to scheme to defraud, in violation of 18 U.S.C §1341 and 1343.

Pattern of Racketeering Activity and Predicate Acts of Mail and Wire fraud

171.    At all relevant times, in violation of 18 U.S.C §1962(c), the RICO defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C §1961(5) by virtue of the conduct described in this complaint. Defendants have

46

conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

172.    SPS entered into servicing agreements with lenders or alleged holders of whole loans, here JPMCB which provide that SPS is obligated to make sure that the secured properties, including Izmirligil's home, are adequately insured, including through force-placement of insurance, if necessary.

173.    SPS procures force-placed insurance with respect to the loans in its servicing portfolio from the Assurant defendants.

174.    SPS demanded and the Assurant defendants agreed to and do pay kickbacks/bribes to SPS and/or affiliates based on a percentage of the force-placed insurance premiums paid by SPS;

175.    SPS and the Assurant defendants agreed to and do gross-up the stated premiums on the force-placed insurance to include the amounts of the kickbacks/bribes.

176.    SPS and the Assurant defendants agreed to and do disguise the kickbacks/bribes as "commissions" paid by the Assurant defendants to SPS and other SPS affiliate(s).

177.    As a quid pro quo for the kickbacks/bribes, SPS continues to procure force-placed insurance from and outsource its force-placed insurance functions to the Assurant defendants, even when the homeowner has his own valid hazard insurance policy, where, as here, Izmirligil had never lapsed his hazard insurance policy, but SPS had created "one artificially inflated policy" for him, after SPS had "fraudulently/artificially lapsed his current and valid policy".

178.    The Assurant defendants on behalf of SPS, track the loans to the servicing portfolio of SPS, and issue notices to the homeowners, here the "form letters" were sent to

Izmirligil on December 16, 2013 and on January 20, 2014, relating to purported lapses in their insurance coverage and their obligation to reimburse SPS for the cost of any force-placed insurance, where Izmirligil had promptly responded back with his letters and via faxes sent to SPS and ASIC, informing them that he has his own hazard insurance coverage, and previous servicer JPMCB has the insurance information and "not" to force-place any policy on his property; on November 4, 2013; on December 23, 2013; and on December 27, 2015, otherwise, Izmirligil will initiate a lawsuit against SPS, ASIC, and Assurant.

179.    SPS bills Izmirligil, and other home owners in relation to force-placed insurance based on the stated, fraudulently created and lapsed, and fraudulently inflated premiums, incorporating the kickbacks. Here, SPS charged $10,032.00 per annum for Izmirligil's hazard insurance policy where Izmirligil had paid $2,872.00 for his own "better" coverage.

180.    To the extent that homeowners pay the artificially inflated costs billed to them, including Izmirligil, ASIC and/or Assurant also profit from the kickbacks/bribes at the homeowner's expense.

181.    To the extent homeowners fail to pay the artificially created and inflated costs billed to them, SPS reimburses itself from the proceeds of loan collections and liquidations also based on the stated, fraudulently inflated premiums, thereby profiting from the kickbacks/bribes at the expense of the lenders of the loan.

182.    SPS provides regular remittance and other reports to lender(s) and/or alleged loan owner(s) reflecting and/or incorporating the fraudulently created and fraudulently inflated premiums as reimbursable servicing advances, where, as here; **first**, Izmirligil had never lapsed his own hazard insurance and had always had his insurance since July 26, 2006 to present; and, **second**, Izmirligil was not in default in payment on or around April 1, 2009, simply because the

SPS's own Escrow accounting records and other records clearly demonstrate the "**surplus**" in the amount of $11,152.64 on April 4, 2009 and/or another "**surplus**" in the amount of $1,646.30 on July 21, 2009 when the first servicer (JPMCB) and the second and current servicer (SPS) fraudulently declared that Izmirligil was in default in payment. Despite this, CHF, who was not the lender nor servicer nor the party to The 2009 Foreclosure Action, sent a letter dated July 22, 2009 titled "Acceleration Warning (Notice of Intent to Foreclose)" which did not even have scintilla of validity as a "Notice of Default" under mortgage and note agreements, requesting alleged three (3) month late payments in the amount of $33,117.38 as of July 21, 2009.

183.    SPS currently demands $2.2 million with respect to the mortgage loan account, and SPS deponents Diane Weinberger and Kajay Williams fraudulently filed two "Affidavits of Merit", recently on February 2, 2017, committing perjury under oath by falsely swearing with respect to the fraudulently prepared "Detailed Payment Transaction History". In contrast, SPS's "Escrow Transaction Records" and other records clearly and unquestionably demonstrate the "opposite", where the "first" Affidavit of Merit of SPS's affiants ("Weinberger Affidavit" and "Williams Affidavit") for the "first" order of reference was invalidated by two (2) orders of the Second Department of Appellate Division on November 30, 2016 in The 2009 foreclosure case, and further, SPS and its deponents still cannot comply with Administrative Orders (AO/431/11) that merely requires it to verify the validity of its own 2009 foreclosure claim, among others, the escrow history and payment transactions, including the fraudulently created and fraudulently charged for, Lender forced-placed insurance premiums, since November 1, 2013, against Izmirligil.

184.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C §§1341 and 1343. Specifically, RICO defendants, SPS, ASIC and

Assurant engaged in an intentional scheme or artifice to defraud Izmirligil and other homeowners of SPS-serviced loans and to obtain "money" or "property" from the Izmirligil and from the other homeowners of SPS-serviced loans through false and fraudulent pretenses, representation and promises.

185.    At all relevant times, RICO defendants' conduct included a fraudulent scheme to, inter alia, deprive Izmirligil and the other homeowners of SPS-serviced loans of their right to SPS's "honest services" through bribes and kickbacks in violation of 18 U.S.C §1346. At all relevant times, SPS was contractually obligated to render services to the owners of the loans, including Izmirligil, it serviced. SPS owed a duty to render those services in an honest manner. The value of those services in fact depended on the SPS's rendering them in an honest matter. Nevertheless, at all relevant times, SPS misused its position to extract bribes and kickbacks from Assurant defendants, thereby fraudulently "created lapses" and "fraudulently inflated the costs of force-placed insurance" at the expense of the home owners, including Izmirligil who had never lapsed his own hazard insurance policy and was never defaulted in payment, on or around April 2009 and/or July 2009. Moreover, SPS is obligated to reveal the "truth" of its 2009 foreclosure claim and if it did so that would mandate the "dismissal" of The 2009 Foreclosure Action against Izmirligil, immediately.

186.    SPS thereby breached its obligations to render "honest services". ASIC and Assurant defendants intentionally and willfully conspired and participated in said breach.

187.    Each and such bribe or kickback extracted by SPS constituted a predicate act of mail and wire fraud in that each furthered and executed the scheme to deprive the home owners and loan owners of their right to SPS defendant's "honest services", including Izmirligil.

188.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire

and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to the RICO defendants' books and records. Nevertheless, Izmirligil can allege such transmissions, generally.

189.    For the purpose of furthering and executing the scheme, the RICO defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. For example:

190.    ASIC and Assurant, on SPS's behalf, transmitted notices and correspondence to Izmirligil and to other home owners via mail.

191.    SPS issued monthly statements including force-placed insurance charges to Izmirligil and to other home owners via mail and/or wire.

192.    ASIC and Assurant, on SPS behalf, communicated with home owners, including Izmirligil via telephone through call centers.

193.    SPS received funds from home owners, including Izmirligil, and/or SPS still demands funds from home owners, including Izmirligil, via mail and/or wire.

194.    SPS transmitted funds reflecting fraudulently created and fraudulently inflated insurance premiums to ASIC and Assurant via mail and/or wire.

195.    ASIC and Assurant transmitted funds reflecting bribes and kickbacks to SPS via mail and/or wire.

196.    SPS transmitted remittance and reports to the home owners, including Izmirligil and/or alleged loan holders via mail and/or wire that reflected and/or incorporated the

fraudulently created and fraudulently inflated force-placed insurance costs where, as here, Izmirligil was never in default in payment on or around April 2009 and/or July 2009, and never had lapsed his hazard insurance coverage since July 26, 2006—including on or around November 1, 2013—to present.

197.    As to Izmirligil, the RICO defendants utilized the mails and/or wires in the following instances, among others, for the purpose of furthering and executing the scheme:

198.    The ASIC and Assurant defendants and/or SPS defendant transmitted notices to Izmirligil regarding force-placed insurance by mail dated October 29, 2013; December 16, 2013; January 20, 2014.

199.    SPS transmitted statements to Izmirligil reflecting charges in connection with force-placed insurance by mail dated February 24, 2014; February 26, 2015; January 27, 2016; and February 21, 2017.

200.    SPS, ASIC, and Assurant's call center representatives communicated with Izmirligil by wire regarding force-placed insurance December 23, 2011 (with SPS, at 1-801-293-3936, attention to: Camrhan Lockett); on December 25, 2013 (with ASIC at 1-801-269-4269); on December 25, 2013 (with SPS, at 1-866-801-8177); on December 28, 2015 (with ASIC, at 1-801-270-7856); and on February 13, 2016 (with the attorney of the SPS via e-mail, dmignardi@eckertseamans.com).

201.    These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by the RICO defendants. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, the RICO defendants engaged in similar activities with respect to the other homeowners.

202.    Each such electronic and/or postal transmission was incident to an essential part of the scheme.

203.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud Izmirligil, the homeowners and/or the owners of the loan.

204.    The RICO defendants each participated in the scheme to defraud knowingly, willfully, and with a specific intent to defraud Izmirligil and homeowners and/or the owners of the loans into paying and/or incurring fraudulently created LPI policies and fraudulently inflated charges in connection with force-placed insurances.

205.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C §1961(5). The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding Izmirligil, the homeowners and/or the owners of the loans to pay and incur fraudulently originated LPI policies and fraudulently inflated charges in respect of force-placed insurance and thereby enable the RICO defendants to reap illicit profits.

206.    The RICO defendants were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Izmirligil, home owners and/or the owners of the loans, as such in Almanzar v. SPS, ASIC, Assurant, SGIC, Case No: 14-cv-22586 (MORENO, J) in the District Court, Southern District of Florida where Izmirligil is an opted-out class-member, and further, the class action is later settled in the amount of $44.75 million on March 25, 2016.

207.    As a direct and proximate result of the RICO defendants' violations of 18 U.S.C §1962(c), Izmirligil and the home owners have been injured in their business or property within

the meaning of 18 U.S.C §1964(c). At all relevant times, Izmirligil and the other home owners

paid charges or billed to be paid in connection with force-placed insurance that fraudulently

created the policies and fraudulently inflated the costs by reason, and as a direct, proximate and

foreseeable result of the scheme alleged.

208.     Under the provisions of 18 U.S.C §1964(c), the RICO defendants are jointly and

severely liable to Izmirligil for three times the damages sustained, plus the costs of bringing this

suit, including reasonable attorney's fees.

### COUNT-VII

### CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C §1962(d)
### (Against all Defendants)

209.     Plaintiff repeats, reiterates and realleges the allegations set forth in all prior

paragraphs of this complaint as if fully set forth herein at length. This count is pled against all

defendants.

210.     RICO, 18 U.S.C §1962(d), provides that it "Shall be unlawful for any person to

conspire to violation any of the provisions of subsection (a), (b), or (c) of this section."

211.     The RICO defendants have violated 18 U.S.C §1962(d) by conspiring to violate

18 U.S.C §1962(c).

212.     As set forth in Count-VI, above, at all relevant times, Plaintiff was "person"

within the meaning of RICO, 18 U.S.C §§1961(3) and 1962(c).

213.     As set forth in Count-VI, above, Defendants were "persons" within the meaning

of RICO, 18 U.S.C §1961(3) and 1962(d).

214.     Defendants formed the previously alleged association-in-fact Enterprise, within

the meaning of 18 U.S.C §1964(4), for the common purpose of fraudulently creating LPI

policies and fraudulently inflating the stated premiums on force-placed insurance with respect to

SPS-serviced loans. The purpose thereof was to induce Izmirligil and the other home owners

and/or the owners of the loan to pay and incur fraudulently created LPI policies and

fraudulently inflated charges in respect of such fraudulently insurance.

215.    The Enterprise was engaged in, and its activities affected interstate commerce

within the meaning of 18 U.S.C §1962(c).

216.    As set forth in Count-VI, above, the RICO defendants associated with the

Enterprise, conducted or participated, directly or indirectly, in the conduct of the Enterprise's

affairs through a pattern of racketeering activity within the meaning of 18 US.C. §1961(5) in

violation of 18 U.S.C §1962(c).

217.    The RICO defendants each were associated with the Enterprise and agreed and

conspired to violate 18 U.S.C §1962(c), and agreed to conduct and participate, directly or

indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering

activity in violation of 18 U.S.C §1962(d).

218.    The RICO defendants committed and caused to be committed a series of avert

acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited

to the acts set forth in Count-VI, above.

219.    As a direct and proximate result of The RICO defendants' overt acts and

predicate acts in furtherance of violating 18 U.S.C §1962(d) by conspiring to violate 18 U.S.C

§1962(c), Izmirligil and other home owners have been and are continuing to be injured in their

business and property in an amount to be determined at trial. Such injuries include, but are not

limited to, fraudulently created LPI policies and fraudulently inflated charges in respect of

force-placed insurance where, as here, Izmirligil had never lapsed his own hazard insurance and

never had been defaulted in payment on or around April 1, 2009 and/or on July 21, 2009, but SPS is still pursuing an unwarranted 2009 Foreclosure Action by relying on fraudulently prepared Payment Transaction History, against Izmirligil, by reason, and as a direct, proximate, and foreseeable result, of the scheme alleged herein.

220.    Under the provisions of 18 U.S.C §1964(c), the RICO Defendants are jointly and severely liable to Izmirligil for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter Judgment against Defendants and in favor of Plaintiff as follows:

A.  That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

B.  That Defendants be Enjoined from continuing the acts and practices described herein;

C.  For an Order awarding compensatory damages in favor of Plaintiff in an amount to be determined at trial;

D.  For Judgment for Plaintiff on his RICO claims, in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair and/or deceptive practices; along with exemplary damages to Plaintiff for each violation;

E.  For Judgment in favor of Plaintiff on his RICO claims, in an amount to be proven at trial, for three times the amount of the force-placed insurance charges imposed by the Defendants against Plaintiff;

F.  For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiff;

G.  For pre-Judgment and post-Judgment interest as provided for by law and as allowed

in equity.

H.   Awarding Plaintiff his attorney's fees and costs, and,

I.   Such other and further relief as may appear necessary and appropriate.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff demands a trial by jury of the

claims alleged herein.

Dated: Melville, New York
   October 18, 2017

     **The Law Offices of David L. Singer, P.C.**
     *Attorneys for Plaintiff*

  By: _____
     David L. Singer, Esq.
     150 Broadhollow Road, Suite 122
     Melville, New York 11747
     (631) 923-2399
     singer@davidlsingerpc.com

## __INDIVIDUAL VERIFICATION__

STATE OF NEW YORK    )

                       ) ss.:

COUNTY OF SUFFOLK    )

    **DR. ARIF IZMIRLIGIL,** being duly sworn, hereby deposes and says the following:

    I am the plaintiff in the above-entitled action. I have read the foregoing verified complaint and know the contents thereof; that the same is true to my knowledge, except as to the matters stated to be alleged upon information and belief, and that as to those matters I believe them to be true.

_____
**DR. ARIF IZMIRLIGIL**

Sworn to before me this
18th day of October, 2017

_____
**DAVID L. SINGER**
Notary Public – State of New York
No.02SI6187379
Qualified in Suffolk County
Commission Expires 05/19/2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
DR. ARIF S. IZMIRLIGIL,                                                    Civil Action No:

                Plaintiff,

             -against-

SELECT PORTFOLIO SERVICING, INC.,
AMERICAN SECURITY INSURANCE
COMPANY, and ASSURANT, INC.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

---

## VERIFIED COMPLAINT

---

THE LAW OFFICES OF DAVID L. SINGER, P.C.
Attorneys for the Plaintiff
150 Broadhollow Road, Suite 122
Melville, New York 11747
Tel.: (631) 923-2399
Fax: (888) 321-8679
Our File No.: 17- 072 DLS

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney duly admitted to practice in the Courts of New York State and United States District Court for the Eastern District of New York, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.

Dated:  Melville, New York
        October 18, 2017

Signature:  _____
                        David L. Singer, Esq.