UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ARIF S. IZMIRLIGIL,

        Plaintiff,

        v.

SELECT PORTFOLIO SERVICING, INC., *et. al.*,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No. 2:17-06157 (JFB) (AYS)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STRIKE PORTIONS OF THE COMPLAINT BY DEFENDANTS ASSURANT, INC. AND AMERICAN SECURITY INSURANCE COMPANY**

CARLTON FIELDS JORDEN BURT, P.A.
Robert W. DiUbaldo
rdiubaldo@carltonfields.com
Nora A. Valenza-Frost
nzalenza-frost@carltonfields.com
Chrysler Building
405 Lexington Avenue, 36th Floor
New York, New York 10174
Telephone: (212) 785-2577
Facsimile: (212) 785-5203

Frank G. Burt (*pro hac vice*)
fburt@carltonfields.com
Brian P. Perryman (*pro hac vice*)
bperryman@carltonfields.com
1025 Thomas Jefferson Street, NW
Suite 400 West
Washington, DC 20007
Telephone: (202) 965-8100
Facsimile: (202) 965-8104

*Attorneys for Defendants Assurant, Inc. and American Security Insurance Company*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................1

THE COMPLAINT'S ALLEGATIONS .............................................................2

ARGUMENT ......................................................................................................5

I. The Filed-Rate Doctrine Bars Plaintiff's "Kickback"-Based Claims And Allegations ....................................................................................5

II. Plaintiff Fails To State An Aiding And Abetting Claim.........................9

   A. The Claim Is Based On A Nonexistent Fiduciary Duty .............9

   B. The Claim Duplicates The Contract-Based Claims ..................11

III. Plaintiff Fails To State An Unjust Enrichment Claim ..........................11

   A. There Is Nothing Left To Restore To Plaintiff .........................12

   B. The Unjust Enrichment Claim Repackages The Other Claims ................12

   C. An Express, Written Contract Governs The Parties' Rights.....................13

   D. The Conduct Alleged Is Not "Unjust" ......................................13

IV. Plaintiff Fails To State A RICO Claim ................................................15

   A. Defendants Are Alleged To Have Conducted Their *Own* Affairs, Not Those Of Some Autonomous Criminal Enterprise...............16

   B. The Complaint Alleges A Contractual Dispute, Not A Fraud ..................17

   C. The Complaint Does Not Plead Proximate Causation ..............................19

   D. The RICO Conspiracy Claim Also Necessarily Fails...............................21

V. Dismissal Should Be With Prejudice ...................................................21

VI. If The Court Does Not Dismiss The Complaint With Prejudice, It Should Strike As Immaterial Allegations About Class Action And Regulatory Settlements .........................................................................21

CONCLUSION..................................................................................................24

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Almanzar v. Select Portfolio Servicing, Inc.*,
    2016 WL 1169198 (S.D. Fla. Mar. 25, 2016) ....................................................................23

*Babb v. Capitalsource, Inc.*,
    588 F. App'x 66 (2d Cir. 2015) ....................................................................21

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988) ....................................................................20

*Bridge v. Phoenix Bond & Indemnity Co.*,
    553 U.S. 639 (2008) ....................................................................16, 19, 20

*Clarizia v. Ocwen Financial Corp.*,
    2016 WL 439018 (S.D.N.Y. Feb. 2, 2016) ....................................................................7

*Cohen v. American Security Insurance Co.*,
    735 F.3d 601 (7th Cir. 2013) ....................................................................13, 14, 15

*Corsello v. Verizon New York, Inc.*,
    18 N.Y.3d 777, 944 N.Y.S.2d 732 (2012) ....................................................................12

*Cortec Industries, Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ....................................................................3

*Curtis v. Cenlar FSB*,
    2013 WL 5995582 (S.D.N.Y. Nov. 12, 2013) ....................................................................7

*Dent v. United States Tennis Association*,
    2008 WL 2483288 (E.D.N.Y. June 17, 2008) ....................................................................23

*D. Penguin Bros. v. City National Bank*,
    587 F. App'x 663 (2d Cir. 2014) ....................................................................17

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
    837 F. Supp. 2d 162 (S.D.N.Y. 2011) ....................................................................11, 13

*Feaz v. Wells Fargo Bank, N.A.*,
    745 F.3d 1098 (11th Cir. 2014) ....................................................................13, 14

*Gorham-DiMaggio v. Countrywide Home Loans, Inc.*,
    421 F. App'x 97 (2d Cir. 2011) ....................................................................10

*Gorham-DiMaggio v. Countrywide Home Loans, Inc.*,
    592 F. Supp. 2d 283 (N.D.N.Y. 2008) ....................................................................10

*Gotlin v. Lederman*,
   367 F. Supp. 2d 349 (E.D.N.Y. 2005)................................................................22

*Griffith-Fenton v. JPMorgan Chase*,
   2015 WL 10850340 (S.D.N.Y. Nov. 12, 2015) ...................................................15

*Hemi Group LLC v. City of New York*,
   559 U.S. 1 (2010) ..............................................................................................19

*Herbert v. HSBC Mortgage Services*,
   2014 WL 3756360 (E.D.N.Y. June 30, 2014)......................................................21

*Hourani v. Wells Fargo Bank, N.A.*,
   158 F. Supp. 3d 142 (E.D.N.Y. 2016)............................................................10, 13

*Kilgore v. Ocwen Loan Servicing, LLC*,
   89 F. Supp. 3d 526 (E.D.N.Y. 2015)...................................................................13

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976)................................................................................23

*Lyons v. Litton Loan Servicing LP*,
   158 F. Supp. 3d 211 (S.D.N.Y. 2016)...................................................................7

*Miller v. Wells Fargo Bank, N.A.*,
   994 F. Supp. 2d 542 (S.D.N.Y. 2014) .......................................................... *passim*

*New York State Catholic Health Plan, Inc. v. Academy O&P Associates*,
   312 F.R.D. 278 (E.D.N.Y. 2015) ............................................................13, 18, 19

*Physicians Mutual Insurance Co. v. Greystone Servicing Corp.*,
   2009 WL 855648 (S.D.N.Y. Mar. 25, 2009) ......................................................11

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ...........................................................................................17

*Rosner v. Star Gas Partners, L.P.*,
   344 F. App'x 642 (2d Cir. 2009).........................................................................21

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)....................................................................................3

*Rothstein v. Balboa Insurance Co.*,
   794 F.3d 256 (2d Cir. 2015)........................................................................ *passim*

*Roussin v. AARP, Inc.*,
   379 F. App'x 30 (2d Cir. 2010).............................................................................6

*Roussin v. AARP, Inc.*,
    664 F. Supp. 2d 412 (S.D.N.Y. 2009) ...................................................................6

*Sergeants Benevolent Association Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
    806 F.3d 71 (2d Cir. 2015) ........................................................................................20

*Trevathan v. Select Portfolio Servicing, Inc.*,
    142 F. Supp. 3d 1283 (S.D. Fla. 2015) ...................................................................7

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010) ...................................................................................21

*United States v. Halloran*,
    821 F.3d 321 (2d Cir. 2016) ...................................................................................16

*Waterford Township Police & Fire Retirement System v. Smithtown Bancorp, Inc.*,
    2014 WL 3569338 (E.D.N.Y. July 18, 2014) .........................................................23

*Woodhams v. Allstate Fire & Casualty Co.*,
    453 F. App'x 108 (2d Cir. 2012) .............................................................................16

*Woodhams v. Allstate Fire & Casualty Co.*,
    748 F. Supp. 2d 211 (S.D.N.Y. 2010) ....................................................................16

**Statutes and Rules**

18 U.S.C. § 1341 .............................................................................................................16

18 U.S.C. § 1343 .............................................................................................................16

18 U.S.C. § 1346 .............................................................................................................16

18 U.S.C. § 1961 ..........................................................................................................2, 16

18 U.S.C. § 1962 ....................................................................................................*passim*

18 U.S.C. § 1964 .............................................................................................................16

Fed. R. Civ. P. 12 .......................................................................................................21, 22

Fed. R. Evid. 201 ..............................................................................................................6

This is one of many similar lawsuits brought in the past several years against lenders, servicers, and insurers that challenge their business practices in connection with so-called "force-placed" or "lender-placed" hazard insurance ("LPI") for residential mortgaged property. Because the property serves as the loan's collateral, the typical mortgage requires the borrower to maintain adequate, continuous property insurance. If a borrower breaches that contractual obligation and does not obtain acceptable insurance, even after receiving multiple notices of non-compliance from the servicer, the mortgage authorizes the lender to obtain LPI to protect its interests and to recoup the premium from the borrower. Premiums for LPI are charged to and deducted from the borrower's escrow account or added to the loan's balance.

Plaintiffs in these suits have advanced, unsuccessfully, various theories of liability. The principal theory, also alleged here, is that insurers like defendant American Security Insurance Company ("American Security") supposedly paid commissions, expense reimbursements, or other compensation to servicers like defendant Select Portfolio Servicing, Inc. ("SPS") or their licensed agency affiliates in connection with the LPI. Plaintiffs in these suits characterize the payments as "kickbacks." They assert that they were overbilled when they were charged the full LPI rates (which were approved by state insurance regulators), instead of lower rates net of the value of the so-called "kickbacks." A second theory is that defendants improperly "backdate" LPI by arranging for the policies to be made effective as of the date voluntary coverage lapsed, which is prior to the date the policies were physically issued. And a third theory is that the LPI placement was unnecessary because the plaintiff supposedly had adequate coverage in place.

Fueled by these theories, plaintiff Arif S. Izmirligil asserts common-law claims against American Security and its grandparent holding company, defendant Assurant, Inc. ("Assurant"

and, together with American Security, "the Assurant Defendants") for aiding and abetting SPS's breach of an alleged fiduciary duty (Count IV), and for unjust enrichment (Count V), and statutory claims for alleged violations of § 1962(c) and (d) of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (Counts VI and VII). These claims fail if for no other reason than that defendants have already refunded every penny charged to plaintiff's escrow account for LPI. Moreover, numerous courts within this Circuit, including the Second Circuit itself, have rejected identical claims. This case should meet the same fate.

## THE COMPLAINT'S ALLEGATIONS

Teasing out the pertinent facts of this case is a challenge. The Complaint intersperses, in pell-mell fashion, references to a 2003 judicial consent order, a 2013 regulatory consent order, several class action complaints and a settlement, a 2009 foreclosure action against plaintiff, the securitization of his mortgage loan, a so-called "double-booking fraud" involving certain nonparties, and a selection of correspondence sent by both sides and their counsel, all before asserting seven counts laid out in classic "shotgun pleading" style. It remains unclear how most of this is relevant to the claims asserted, much less tend to prove the truth of anything alleged.

Apparently, plaintiff has had a contentious, lengthy history with SPS, his mortgage loan servicer. With respect to the Assurant Defendants, however, plaintiff's history is much more limited. In total, American Security once issued LPI covering plaintiff's mortgaged property, the premium cost of which has since been fully refunded to plaintiff's escrow account.

Placement of the LPI was authorized by Section 5 of plaintiff's mortgage. Under that instrument, plaintiff is required to maintain adequate, continuous insurance on the property. If plaintiff fails to maintain adequate insurance, then the "Lender" or its assigns (here, SPS) is permitted purchase and charge for insurance sufficient to protect the mortgaged collateral:

> If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument.

ECF No. 1-17 § 5.[1]

In November 2013, American Security sent a letter on SPS's behalf advising that plaintiff's hazard insurance had expired, and that there was no evidence plaintiff had obtained new coverage. Declaration of Ronald Wilson ("Wilson Decl."), filed herewith, Ex. A.[2] The November 2013 letter urged plaintiff to "immediately provide us with your insurance information. Please contact your agent or carrier and purchase coverage." *Id.* It indicated that

---

[1] This sort of arrangement is "typical" in residential mortgages:

> The purchase of residential property is often financed through a mortgage loan secured by the subject property. Until repayment of the loan, the lender holds a security interest in the property (*i.e.,* the mortgage) in the unpaid amount. To mitigate the risk that the mortgaged property will be damaged or destroyed before the loan is repaid, the lender can require the borrower to maintain hazard insurance sufficient to cover the lender's interest. In a typical mortgage loan arrangement, if the borrower fails to maintain adequate hazard insurance, the lender can purchase insurance on the borrower's behalf and then seek reimbursement from the borrower.

*Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 259-60 (2d Cir. 2015).

[2] Not all the documents appended as exhibits to the Wilson Declaration are also exhibits to the Complaint. The Court may nonetheless consider these documents on this motion to dismiss without converting the motion to one for summary judgment because plaintiff either possessed or knew about and relied upon them in bringing the suit. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000). Indeed, the Complaint explicitly, repeatedly references these documents, which are central at least to the RICO claims asserted, if not plaintiff's other claims. *See, e.g.*, ECF No. 1 ¶¶ 27, 43, 83, 133, 178, 190, 198. Where, as here, "plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

SPS planned to buy its own insurance, which "[m]ay be more expensive than the insurance you can buy yourself," and "not provide as much coverage as an insurance policy you buy yourself." *Id.* The letter also explained some "[t]hings to know about lender placed insurance":

- The cost of the premium may be much higher
- The coverage provided may be less than before
- The coverage may only protect the mortgage holder
- This type of policy/certificate insures your structure only
- Does not protect you against injuries that occur on your property
- Does not protect your personal property

*Id.* The November 2013 letter emphasized that "[t]here is still time to renew your policy or finalize coverage with a new company, and we urge you to do so." *Id.*

In December 2013, a "second and final notice" was sent to plaintiff advising that there was still no evidence he had obtained insurance covering the property. Wilson Decl. Ex. B. The December 2013 letter contained disclosures similar to the November 2013 letter, and estimated that the LPI's cost would be $10,032 annually. *Id.* It enclosed a 56-day insurance binder. *Id.*

Because proof of acceptable insurance was not provided, in January 2014 notice was given to plaintiff that SPS had, in fact, purchased insurance. Wilson Decl. Ex. C. The January 2014 letter enclosed a residential policy issued by American Security covering the period from November 1, 2013 to November 1, 2014. *Id.* This letter repeated the disclosures contained in both the November 2013 and December 2013 letters, including explaining that plaintiff had the right to purchase insurance from the insurance company of his choice and that the LPI "may be cancelled at any time by providing us with acceptable proof of other insurance," such that plaintiff would "only be charged for the days that this policy/certificate was necessary." *Id.*

By July 2014, plaintiff had provided some evidence of insurance. Wilson Decl. Ex. D. A letter dated that month advised plaintiff that the cancellation effective date had been adjusted to July 26, 2014. *Id.* However, the July 2014 letter continued, there was "still a lapse in coverage

from 11/01/2013 to 07/26/2014." *Id.* A total charge of $7,343 was assessed to plaintiff's escrow account for the LPI covering that period. *Id.* The letter further explained that, "to have this charge removed from your account, please provide us with evidence of insurance for this lapse period." *Id.* "Any unused premium," the letter stated, "will be refunded to your account once we receive proof of acceptable coverage." *Id.*

Plaintiff filed the instant lawsuit three years later, on October 23, 2017. Exhibit 7 to his Complaint included a homeowner policy declaration page suggesting that there had been continuous coverage on the property, including between November 1, 2013 and July 26, 2014. ECF No. 1-7. On this basis, before the Complaint was served on either of the Assurant Defendants, a "Lender-Placed Insurance Confirmation of Cancellation" was sent to plaintiff. Wilson Decl. Ex. E. This October 2017 letter explained that the "Named Insured Mortgagee/Lender" had "requested cancellation of the lender-placed insurance that was issued in compliance with your mortgage/lien agreement. This cancellation is effective at 12:01 a.m. on 11/01/2013." *Id.* Plaintiff concedes that the LPI has now been flat-cancelled. ECF No. 11 at 2.

## ARGUMENT

### I.  The Filed-Rate Doctrine Bars Plaintiff's "Kickback"-Based Claims And Allegations.

The centerpiece allegation against the Assurant Defendants is that they, together with SPS and SPS's unspecified affiliates, acted to "maximize their revenues by fraudulently forcing Plaintiff and other victims to pay fraudulently inflated – unreasonably high amounts for force-placed insurance through a scheme that inflated such charges to cover briberies, kickbacks, and expenses associated with monitoring SPS's entire loan portfolio," ECF No. 1 ¶ 168, and that "the Assurant defendants agreed to and do gross-up the stated premiums on the force-placed insurance to include the amounts of the kickbacks/bribes." *Id.* ¶ 175. For relief, the Complaint

seeks damages and restitution in the form of the supposedly "excessive," "exorbitantly priced," and "fraudulently inflated" portions of the LPI premium. *See, e.g.*, *id.* ¶¶ 153, 158, 207, 219.

The filed-rate doctrine precludes just such allegations and relief. Under that doctrine, any filed rate – that is, one approved by the governing regulatory agency – is *per se* reasonable and unassailable in judicial proceedings brought by ratepayers. *Rothstein*, 794 F.3d at 261. The doctrine is grounded on two rationales: first, that courts should not undermine agency ratemaking authority by upsetting approved rates ("nonjusticiability"); and, second, that litigation should not become a means for certain ratepayers to obtain preferential rates ("nondiscrimination"). *Id.* The doctrine reaches both federal and state causes of action and protects rates approved by federal or state regulators. *Id.* Its application does not depend on the nature of the cause of action the plaintiff seeks to bring or the culpability of the defendant's conduct or the possibility of inequitable results. *Id.* at 261-62. Whenever a ratepayer's claim against a rate filer would implicate either the nonjusticiability or nondiscrimination principles, it is barred. *Id.* at 262.

Here, LPI premiums were calculated using a rate filed with and approved by the New York Department of Financial Services, a matter of public record. *See* Wilson Decl. ¶¶ 13-17; Declaration of Rebecca Voyles, filed herewith, ¶¶ 6-8.[3] By seeking to recover the allegedly "inflated" portion of the rate-based premium, plaintiff is effectively mounting an attack on the LPI rate itself. The nonjusticiability principle is thus offended. The claims would require a judge or jury to parse those portions of the approved premium rates attributed to "kickbacks," and then award those portions as damages. Adjudicating such claims would enmesh the Court in retroactive judicial ratemaking – to calculate the amount of "kickbacks," the Court would need to

---

[3] The Court can and should take judicial notice that the New York Department of Financial Services has approved the precise rates challenged here. *See* Fed. R. Civ. P. 201(b); *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 416 (S.D.N.Y. 2009), *aff'd*, 379 F. App'x 30 (2d Cir. 2010). "The court may take judicial notice at any stage of the proceeding." Fed. R. Evid. 201(d).

determine a lawful rate and then subtract it from the premium. Furthermore, the nondiscrimination principle, which ensures that all ratepayers are charged the same rate, also is offended. Awarding damages only to plaintiff means that other American Security LPI ratepayers, including SPS-serviced borrowers in New York, would, in effect, pay a higher rate.

Applying the filed-rate doctrine, many courts have dismissed LPI "kickback" claims identical to those asserted here, including claims asserted against the Assurant Defendants, SPS, and other LPI carriers and residential mortgage servicers. *See, e.g.*, *Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 224-30 (S.D.N.Y. 2016); *Clarizia v. Ocwen Fin. Corp.*, 2016 WL 439018, at *3 (S.D.N.Y. Feb. 2, 2016); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 553-54 (S.D.N.Y. 2014); *Curtis v. Cenlar FSB*, 2013 WL 5995582, at *3 (S.D.N.Y. Nov. 12, 2013). Relying on Second Circuit precedent, one court dismissed identical claims against SPS and the Assurant Defendants on this very basis. *Trevathan v. Select Portfolio Servicing, Inc.*, 142 F. Supp. 3d 1283, 1287-88 (S.D. Fla. 2015).

Most notably, in *Rothstein v. Balboa Insurance Co.*, *supra*, the Second Circuit reversed a district court that held otherwise and refused to dismiss the complaint. 794 F.3d at 262-66. As here, the *Rothstein* plaintiffs' loan servicer (GMAC) purchased coverage from an LPI provider (Balboa) at approved rates. *Id.* As here, the servicer sought reimbursement from the plaintiffs at those same rates. *Id.* Asserting RICO claims, the plaintiffs alleged that they were overcharged for LPI because the rates included secret "kickbacks" GMAC received from Balboa through a Balboa affiliate (Newport). *Id.* Balboa moved to dismiss under the filed-rate doctrine. *Id.* The district court denied the motion, reasoning that although the rates were approved, that approval did not extend to the borrowers' reimbursement to GMAC. *Id.*

The Second Circuit reversed, holding "that a claim challenging a regulator-approved rate is subject to the filed rate doctrine whether or not the rate is passed through an intermediary. The claim is therefore barred if it would undermine the regulator's rate-setting authority or would operate to give the suing ratepayer a preferential rate." *Id.* "Plainly," such "claims would undermine the rate-making authority of the state insurance regulators who approved Balboa's LPI rates." *Id.* at 262. "The theory behind the claims is that Plaintiffs were overbilled when they were charged the full LPI rates (which were approved by regulators), instead of lower rates net of the value of loan tracking services provided by Newport. That theory can succeed only if the arrangement with Newport should have been treated as part and parcel of the LPI transaction and *reflected in the LPI rates*. But under the nonjusticiability principle, it is squarely for the regulators to say what should or should not be included in a filed rate." *Id.*

The *Rothstein* plaintiffs' claims also ran afoul of the nondiscrimination strand, as damages recovered would effectively operate as a rebate to give putative class members a preference over other borrowers who were charged the same filed LPI rate. *Id.* at 263. "While non-suing borrowers serviced by GMAC would be billed at the filed LPI rates, Plaintiffs would enjoy the discount that Newport allegedly provided to GMAC." *Id.*

The Second Circuit rejected the view that two distinct transactions are involved in LPI, only one of which is subject to the doctrine. *Id.* at 264. The *Rothstein* district court had reasoned that "the filed rate doctrine does not apply at all because the doctrine addresses only 'a simple A-to-B transaction – in which A, the insurer, approved a rate and charged it to B,' not the 'A-to-B-to-C' arrangement at issue here, in which the insurer billed the lender and the lender in turn billed the borrower." *Id.* This was erroneous. "The distinction between an 'A-to-B' transaction and an 'A-to-B-to-C' transaction is especially immaterial in the LPI context because LPI travels

invariably 'A-to-B-to-C.'" *Id.* at 265. Moreover, "New York insurance regulators were well aware that approved LPI rates would be fully borne by borrowers." *Id.* at 266. In short, the doctrine "is not limited to transactions in which the ratepayer deals directly with the rate filer" and "operates notwithstanding an intermediary that passes along the rate." *Id.* at 264.

Plaintiff has argued that *Rothstein* is distinguishable because he "has always maintained his own hazard insurance policy" whereas, in *Rothstein* (and other judicial decisions), "the borrowers failed to obtain a homeowner's insurance policy, as required by the mortgage agreement." ECF No. 11 at 1. This "distinction" conflates one theory with another. To the extent plaintiff is asserting, as he appears to be, that the LPI was "inflated" by "kickbacks," then *Rothstein* is both factually and legally indistinguishable. It is immaterial whether the LPI also happened to be wrongfully placed; the "kickback" claims and allegations squarely concern the LPI's pricing. To the extent plaintiff is asserting *only* that the LPI was wrongfully placed, *and disavows any reliance on his "kickback" theory*, then *Rothstein* is less applicable. But plaintiff does not appear to have abandoned that theory. His Complaint states, for example, that his RICO claim "is based on conduct similar to that" alleged in other lawsuits dealing with LPI "kickback" allegations. *See* ECF No. 1 ¶¶ 74, 75, 163, 206; ECF No. 1-1; ECF No. 11 at 2.

## II. Plaintiff Fails To State An Aiding And Abetting Claim.

Plaintiff's enumerated causes of action fail anyway, beginning with the first cause of action asserted against the Assurant Defendants – aiding and abetting a breach of fiduciary duty.

### A. The Claim Is Based On A Nonexistent Fiduciary Duty.

Plaintiff alleges that "SPS was and still is obligated to hold, manage, and control [mortgage] escrow funds in trust, and owed Izmirligil the highest fiduciary duty with respect to the handling of such funds." ECF No. 1 ¶ 142. According to plaintiff, this is because "SPS

holds and controls escrow funds on behalf of Izmirligil, whose mortgage it services; controls the establishment, funding requirements and maintenance of escrow accounts for the purposes of taxes, assessments, insurance premiums, homeowner's association fees and other items …; and is obligated under the mortgage loan agreement to return any excess funds in accordance with the terms of Izmirligil's mortgage." *Id.* ¶ 140. He further alleges that the "Assurant defendants actively induced and/or participated in SPS's breach of fiduciary duty through the conduct described," including "offering SPS the opportunity to reap additional profits and facilitating the realization of such profits through a scheme to force-placed insurance." *Id.* ¶ 151.

The aiding and abetting claim collapses on its foundational premise – that there is a fiduciary duty to breach. Like most other residential mortgages, the mortgage here does not create a fiduciary relationship. Under New York law, "absent specific language in a mortgage establishing a fiduciary obligation, a mortgagee owes no fiduciary duty to a mortgagor with respect to the escrow account." *Gorham-DiMaggio v. Countrywide Home Loans, Inc.*, 592 F. Supp. 2d 283, 294 (N.D.N.Y. 2008), *aff'd*, 421 F. App'x 97 (2d Cir. 2011); *see also Hourani v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 142, 148 (E.D.N.Y. 2016). Here, no such "specific language" exists in plaintiff's mortgage. Section 3(b) of the mortgage, entitled "Lender's Obligations," merely provides that "Lender will use the Escrow Funds to pay the Escrow Items" in a timely way. *See* ECF No. 1-17 § 3(b). A fiduciary duty does not arise simply because the mortgagee agrees to make insurance, tax, or other payments from an escrow account on behalf of the mortgagor. *See Miller*, 994 F. Supp. 2d at 556 (dismissing identically alleged aiding and abetting claim under identically worded mortgage); *Gorham-DiMaggio*, 592 F. Supp. 2d at 295 (dismissing breach of fiduciary duty claim); *Hourani*, 158 F. Supp. 3d at 148 (same). The aiding and abetting claim is thus premised upon a nonexistent fiduciary duty.

## B. The Claim Duplicates The Contract-Based Claims.

Even if an underlying fiduciary duty existed, the aiding and abetting claim fails for the independent reason that plaintiff's fiduciary duty-based claims arise out of the same operative facts as his contract-based claims. Any fiduciary breach alleged arises from purported breaches of the mortgage itself, and not from any extrinsic legal duty. As the Complaint itself makes clear, plaintiff's escrow account was established under the mortgage and is governed by that instrument's express and implied terms. Moreover, the allegations supporting the Complaint's contract-based claims substantially overlap with, if not outright duplicate, the allegations supporting the fiduciary duty-based claims. *Compare* ECF No. 89-138 (contract-based claims) *with id.* ¶¶ 139-148 (fiduciary breach claim) *and id.* ¶¶ 149-154 (aiding and abetting claim).

Where, as here, a fiduciary duty claim is "a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract, the claim is barred as redundant." *Physicians Mut. Ins. Co. v. Greystone Servicing Corp.*, 2009 WL 855648, at *9 (S.D.N.Y. Mar. 25, 2009); *see also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 196 (S.D.N.Y. 2011). *Both* the underlying fiduciary duty claim *and* the derivative aiding and abetting claim should be dismissed on this basis. *See id.*; *Physicians Mut.*, 2009 WL 855648, at *10.

## III. Plaintiff Fails To State An Unjust Enrichment Claim.

The unjust enrichment claim has even less merit. It fails for (at least) four independent reasons: (i) all LPI charges have been fully refunded to plaintiff's escrow account; (ii) the claim impermissibly duplicates plaintiff's other claims, including the aiding and abetting claim; (iii) the written mortgage governs the dispute's subject matter; and (iv) there is nothing "unjust" about the "kickback," "backdating," and "unnecessary coverage" theories advanced here.

### A. There Is Nothing Left To Restore To Plaintiff.

American Security issued LPI covering plaintiff's property, and his escrow account was charged accordingly. The parties agree, however, that the LPI has since been flat-cancelled, so all corresponding charges have been or will be removed from the account. No LPI charges can be restored to plaintiff that have not already been restored.

### B. The Unjust Enrichment Claim Repackages The Other Claims.

In New York, "unjust enrichment is not a catch-all cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled. An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732, 740 (2012). If other tort or statutory claims succeed, "the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects." *Id.* at 791.

Citing this rule, the court in *Miller v. Wells Fargo Bank, N.A.*, *supra*, dismissed an identically alleged unjust enrichment claim on grounds equally applicable here:

> This case does not present the "unusual" circumstances supporting an unjust enrichment claim. Plaintiff alleges the Assurant Defendants unjustly enriched themselves by providing grossly overpriced force-placed insurance policies and by "backdating" policies. These allegations undermine any claim by plaintiff that the Assurant Defendants are "guilty of no wrongdoing." Moreover, plaintiff's unjust enrichment claim simply rehashes his aiding and abetting claim, which similarly accuses the Assurant Defendants of foisting on borrowers "unnecessary, duplicative, and exorbitantly priced force-placed insurance." Plaintiff's unjust enrichment claim must therefore be dismissed.

994 F. Supp. 2d at 557 (internal citations omitted). This Court should hold the same.

## C.    An Express, Written Contract Governs The Parties' Rights.

An unjust enrichment claim may be asserted only in the absence of an agreement between the parties, be it oral, written, or implied-in-fact.  *Kilgore v. Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526, 537 (E.D.N.Y. 2015); *see also Hourani*, 158 F. Supp. 3d at 148.  "That principle applies even where the party seeking to dismiss the claim is not a party to the contract." *Ellington Credit*, 837 F. Supp. 2d at 202 (internal quotation marks omitted).  In New York, "claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract."  *Id.* at 202-03 (internal quotation marks omitted).  Plaintiff's mortgage – the existence and validity of which are undisputed, *see* ECF No. 1 ¶ 67; ECF No. 1-17 – thus precludes the claim against the Assurant Defendants, even though they are not parties to that contract.  The unjust enrichment claim is based on actions taken solely because of the mortgage's existence. While the mortgage does not set forth plaintiff's rights against the Assurant Defendants, it nonetheless constitutes a valid, express contract covering the same subject matter as the unjust enrichment claim, including SPS's authority to place and charge for LPI.

## D.    The Conduct Alleged Is Not "Unjust."

That is not all.  Even if unjust enrichment were a proper legal vehicle for recovery here, none of the three theories advanced is a basis for a restitution.  None is "unjust."  Consider:

*"Kickbacks."*  Two federal courts of appeals have rejected, on the merits, the "kickback" theory advanced here, in both instances involving American Security-issued LPI.  *See Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1110-11 (11th Cir. 2014); *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 611-12, 615 (7th Cir. 2013).  As the Seventh Circuit observed in *Cohen*, "simply calling the commission a kickback doesn't make it one."  *Id.* at 611; *see also N.Y. State Catholic*

*Health Plan, Inc. v. Acad. O&P Assocs.*, 312 F.R.D. 278, 300 (E.D.N.Y. 2015) ("Characterizing a commercial fee-based relationship as a 'kick-back' does not make it one.").

Like plaintiff here, the *Cohen* plaintiff (Schilke) alleged that her lender (Wachovia) secured replacement hazard insurance from American Security and charged her for it, "as specifically permitted under her loan agreement." 735 F.3d at 603. "The premium was more than twice what she had paid for her own policy and included a commission to Wachovia's insurance agency affiliate, again as permitted under the loan agreement. Schilke calls the commission a 'kickback.'" *Id.* The Seventh Circuit refuted that allegation:

> The defining characteristic of a kickback is divided loyalties. But Wachovia was not acting on behalf of Schilke or representing her interests. The loan agreement makes it clear that the insurance requirement is for *the lender's* protection: "All of these insurance policies and renewals of the policies must include what is known as a Standard Mortgagee Clause *to protect Lender*. The form of all policies and renewals *must be acceptable to Lender. Lender will have the right to hold the policies* and renewals." The agreement also gives the lender broad discretion to act to protect its own interest in the property: "Lender may do and pay for whatever it deems reasonable or appropriate *to protect the Lender's rights in the Property*." Wachovia's correspondence with Schilke reiterated the point: "Failure to provide proof of insurance may result in a policy being purchased by us at your expense to protect our interest." And Wachovia conspicuously reminded Schilke that lender-placed insurance could be much more expensive than her own insurance coverage.

*Id.* at 611 (citations omitted). In short, a lender is "not subject to divided loyalties; rather, it was subject to an undivided loyalty to itself, and it made this clear from the start." *Id.* Affirming the dismissal of an unjust enrichment claim asserted against American Security, the Seventh Circuit thus held that "the 'kickback' premise doesn't hold up." *Id.* at 615.

The Eleventh Circuit has joined that view: "We agree with the Seventh Circuit that 'simply calling a commission a kickback doesn't make it one. The defining characteristic of a kickback is divided loyalties. But the lender was not acting on behalf of the borrower or representing her interests. The loan agreement makes it clear that the insurance requirement is

for *the lender's* protection.'" *Feaz*, 745 F.3d at 1111 (quoting *Cohen*, 735 F.3d at 611). On that basis, the Eleventh Circuit affirmed the dismissal of an unjust enrichment claim, among others.

*"Backdating."* Similarly, there is no merit to the much-discredited "backdating" theory. "Many courts have rejected a theory of liability based on 'backdated' insurance coverage in part because banks would have no protection against loss immediately following a lapse." *Griffith-Fenton v. JPMorgan Chase*, 2015 WL 10850340, at *7 (S.D.N.Y. Nov. 12, 2015). "Certainly, it would be neither reasonable nor appropriate to require a borrower to pay for insurance to cover a given period if a lender *knew* that no loss had occurred during that period. But the complaint does not allege plaintiff's property was undamaged during any lapse in coverage. Nor does it allege that plaintiff informed [the lender] there was no damage to his property, that [the lender] inspected the property itself to ascertain its status, or that plaintiff's voluntarily purchased policies included either a 'standard mortgage clause' or a 'Lender's Loss Payable Endorsement.'" *Miller*, 994 F. Supp. 2d at 554. "What if damage occurs during that lapse, but its effect is not apparent until much later (such as mold or structural weakening)? Even if a borrower were communicating with a bank about his breach – a rarity – and even if a bank could simply take a borrower's word that there had been no damage – which no prudent bank could – what happens when the borrower is not aware of the damage? Absent coverage effective on the lapse date, what protects the bank?" *Id.* at 555; *see also Cohen*, 735 F.3d at 613.

*"Unnecessary Coverage."* American Security has flat-cancelled all LPI, so any premiums have been or will be refunded. Any possible "unjustness" already has been abated.

## IV. Plaintiff Fails To State A RICO Claim.

The Complaint asserts that defendants violated RICO, 18 U.S.C. § 1962(c) and (d), but does not plausibly plead the elements essential to these claims. "[T]o state a claim under Section

1962(c), a plaintiff must plead (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Miller*, 994 F. Supp. 2d at 551. "Racketeering activity" means acts indictable under certain criminal statutes, § 1961(1); here, the Complaint alleges violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.[4] In turn, RICO § 1962(d) makes it unlawful "to conspire to violate" § 1962(c). Only a person "injured in his business or property by reason of a violation of section 1962" has statutory standing to sue under RICO. § 1964(c). To establish that an injury was "by reason of" a RICO violation, a plaintiff must plead a predicate act that was both the "but for" and proximate cause of his injury. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). In addition to failing to plead the elements of a RICO violation, the Complaint fails to allege facts sufficient to establish RICO standing.

A. **Defendants Are Alleged To Have Conducted Their *Own* Affairs, Not Those Of Some Autonomous Criminal Enterprise.**

The RICO claims fail out of the gate because the Complaint does not plausibly allege that defendants "conduct" the affairs of a freestanding enterprise. A RICO "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). The Complaint posits an "Enterprise" composed of "SPS, ASIC, and Assurant, including their respective officers, directors, employees, agents, and direct and indirect subsidiaries." ECF No. 1 ¶ 164.

Mere association with an enterprise does not violate § 1962(c). Instead, a RICO defendant must "conduct or participate, directly or indirectly, in the conduct of such enterprise's

---

[4] The Complaint also alleges that plaintiff was fraudulently deprived of a right to SPS's "honest services," in violation of 18 U.S.C. § 1346. *See* ECF No. 1 ¶¶ 185-187. Honest services fraud applies only to cases involving bribery or kickback schemes *in violation of a fiduciary duty. See United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016). As discussed above, SPS owes no fiduciary duty. Moreover, "insurance companies do not owe their policyholders a fiduciary duty under New York law, a principle that goes back over a century." *Woodhams v. Allstate Fire & Cas. Co.*, 748 F. Supp. 2d 211, 223 (S.D.N.Y. 2010), *aff'd*, 453 F. App'x 108 (2d Cir. 2012).

affairs through a pattern of racketeering activity," § 1962(c), meaning that the defendant must "participate[] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). RICO liability "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* at 185.

The Complaint here does not make that showing. It alleges that the Assurant Defendants conducted the purported enterprise by performing functions assigned to them under defendants' master insurance policy and other contractual arrangements. *See* ECF No. 1 ¶¶ 171-178. The Complaint describes the Assurant Defendants' provision of insurance and ancillary services in performing their *own* contractually-assigned obligations, and fulfilling defendants' financial arrangements, not the Assurant Defendants' operation or management of an autonomous criminal organization. Entering into commercial relationships for mutual profit and supplying insurance and ancillary services are activities consistent with a typical contracting relationship.

Defendants' alleged "scheme" could have been carried out in the same manner with or without a connection to a RICO enterprise. The Assurant Defendants would have performed the very same activities alleged in the course of conducting their own business. The allegation that they did so dishonestly does not convert those activities into the conduct of a criminal enterprise. *See D. Penguin Bros. v. City Nat'l Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) ("The complaints may adequately plead that Spiegelman and Williams worked together in some respects to steal plaintiffs' funds, but the complaints create no plausible inference that they did so to advance the political agenda of their purported 'enterprise' or for any shared purpose.").

## B. The Complaint Alleges A Contractual Dispute, Not A Fraud.

Plaintiff labels defendants' conduct "fraudulent" only because that conduct supposedly exceeded defendants' authority under the mortgage to place and charge for LPI via the escrow

account. Misrepresenting contractual authority, or failing to disclose an intent to breach a contract, however, cannot be used to bootstrap RICO claims. "A breach of contract, without more, does not amount to actionable wire fraud." *Catholic Health Plan*, 312 F.R.D. at 299.

*Catholic Health Plan* is instructive. There, the plaintiff (Fidelis) alleged that defendants submitted false claims indicating that one defendant (Academy) "was the actual provider of durable medical equipment to Fidelis' clients when, unbeknownst to plaintiff, Academy was acting as an Independent Practice Association ('IPA'): It was utilizing third-parties within its own network to directly provide the equipment to plaintiff's enrollees. The claim is that plaintiff was injured as a result of the alleged fraudulent scheme; the third-party suppliers were providers that plaintiff would either not have contracted with, or would have contracted with at a lower rate than it did with Academy." *Id.* at 283. This claim, however, "set forth nothing more than a contract dispute." *Id.* at 300. "The sole question in dispute is whether, as a contract matter, Academy had the authority to act as an IPA pursuant to its existing Agreement with Fidelis." *Id.* "Whether plaintiff is entitled to any overpayments turns on whether Academy had the authority to act as an IPA – a question of contract interpretation. Plaintiff may have a civil cause of action against defendants, but the remedy lies in an action for breach of contract, not in a civil RICO claim premised on wire fraud. Plaintiff's allegations regarding Academy's alleged 'kick-back' scheme at most suggest that Academy was acting as an IPA – collecting fees from providers within its network – and that this was in breach of the parties' agreement." *Id.*

Likewise, the Complaint here identifies no factual misrepresentations or omissions that, properly characterized, transcend allegedly improper assertions or exercises of defendants' rights and duties under the mortgage instrument. Section 5 of the mortgage permits SPS to purchase and charge for insurance sufficient to protect the mortgaged collateral. Plaintiff alleges that

defendants overstepped and misstated their contractual authority in doing so, but that is at most a contract dispute, not a fraud. Similarly, Section 3(b) provides that "Lender will use the Escrow Funds to pay the Escrow Items" in a timely way. Plaintiff alleges that defendants misapplied "Escrow Funds" in purchasing LPI, but that too is a contract dispute, not a fraud. Further, the Complaint does not identify any legal duty separate from the duty to perform the mortgage (again, there is no fiduciary duty), or seek special damages otherwise unrecoverable as contract damages. As with *Catholic Health Plan*, the Complaint here, even "when viewed in the light most favorable to the plaintiff, set[s] forth nothing more than a contract dispute." *Id.* at 300.

### C. The Complaint Does Not Plead Proximate Causation.

In addition to failing to plead a plausible scheme to defraud, the Complaint also fails to plead how defendants' purported scheme caused plaintiff any injury. RICO requires a "direct relation" between the injury asserted and conduct alleged. *Hemi Group LLC v. City of New York*, 559 U.S. 1, 11-12 (2010); *Bridge*, 553 U.S. at 654. Here, there is *no* relation – much less a direct one – between the supposed fraud and the LPI's issuance. What defendants may have said or done was irrelevant to whether LPI was placed. As the name suggests, once a borrower fails to provide proof of acceptable coverage, *lender*-placed insurance (or "*force*-placed insurance," as plaintiff prefers) is "automatically issued," ECF No. 1 ¶ 4, and the mortgage escrow account is assessed, regardless of the borrower's participation in or approval of the servicer's decision to mitigate the borrower's default. The "cause" of the alleged injury here is the automatic placement of insurance, not defendants' purported misrepresentations or omissions.

As the court held in *Miller v. Wells Fargo Bank, supra*, "plaintiff has failed to plead how these allegedly deceptive acts or practices caused his alleged injury, namely, paying more than he should have paid for force-placed insurance. The alleged practice of charging more than the

amount needed to protect [SPS's] interest in the property is the reason why plaintiff allegedly paid too much for force-placed insurance. Defendants' purported misrepresentations and omissions about the pricing and costs of force-placed insurance simply had nothing to do with how the price was determined." 994 F. Supp. 2d at 558.

Nor does plaintiff allege whether or how he *relied* on anything defendants said, or were under a legal duty to say, to him. In *Bridge v. Phoenix Bond & Indemnity Co.*, *supra*, the Supreme Court held that plaintiffs asserting RICO claims based on mail fraud need not plead, as an element of RICO, reliance on alleged misrepresentations, 553 U.S. at 641-42, but emphasized that "none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." *Id.* at 658 (emphasis in original). In other words, "the complete absence of reliance may prevent the plaintiff from establishing proximate cause." *Id.* at 658-59.

"Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988). Reliance therefore remains a necessary *fact* in plaintiff's theory of causation even though it is not a necessary *legal element* of a RICO mail-fraud claim. *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015) ("Although reliance on the defendant's alleged misrepresentation is not an element of a RICO mail-fraud claim, the plaintiffs' theory of injury in most RICO mail-fraud cases will nevertheless depend on establishing that someone – whether the plaintiffs themselves or third parties – relied on the defendant's misrepresentation."). The Complaint here is missing that essential factual link. Neither first-party nor third-party reliance is alleged, plausibly or even at all. To the contrary, plaintiff alleges that defendants' letters to him – sent in November 2013, December 2013, and

January 2014 – spurred him to *dispute* the LPI placements. *See* ECF No. 1 ¶ 178. The fraud-based § 1962(c) claim thus fails. *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132-34 (2d Cir. 2010) (affirming dismissal of fraud-based RICO claim where reliance was not adequately alleged); *Herbert v. HSBC Mortg. Servs.*, 2014 WL 3756360, at *8 (E.D.N.Y. June 30, 2014) (dismissing fraud-based RICO claim where reliance was not adequately alleged).

> **D.**     **The RICO Conspiracy Claim Also Necessarily Fails.**

"Because plaintiff has failed to state a substantive RICO claim, his conspiracy claim necessarily fails as well." *Miller*, 994 F. Supp. 2d at 551.

## V.     Dismissal Should Be With Prejudice.

Plaintiff may request that dismissal be without prejudice to allow him the chance to amend his Complaint. The Court should deny any such request. Plaintiff has had ample opportunity to amend his Complaint in response to the Assurant Defendants' objections before they filed the instant motion. Indeed, at the December 11, 2017 pre-motion conference in this matter, ECF No. 16, the Court offered the parties the opportunity to discuss the operative Complaint's deficiencies, which had been particularized and debated in the parties' letters to the Court exchanged ahead of the conference. *See* ECF Nos. 8 & 11. Where, as here, a plaintiff has had "fair warning" of a defendant's stated grounds for dismissal through the pre-motion conference procedure, the Court may properly deny leave to amend, making dismissal with prejudice. *See Babb v. Capitalsource, Inc.*, 588 F. App'x 66, 68-69 (2d Cir. 2015); *Rosner v. Star Gas Partners, L.P.*, 344 F. App'x 642, 644-45 (2d Cir. 2009).

## VI.     If The Court Does Not Dismiss The Complaint With Prejudice, It Should Strike As Immaterial Allegations About Class Action And Regulatory Settlements.

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The Complaint is replete

with allegations and exhibits concerning a regulatory consent order and class action complaints and settlements. Plaintiff attempts to use these allegations to vilify the Assurant Defendants and as "proof" of the truth of the matters that led to them, *i.e.*, that defendants' LPI practices are unlawful. The references have no bearing on the lawsuit's subject matter, are inflammatory, and would be inadmissible at trial anyway. They should be stricken from the Complaint.

In this Circuit, "courts hold that references in pleadings to agreements with state or federal agencies may properly be stricken on a Rule 12(f) motion." *Gotlin v. Lederman*, 367 F. Supp. 2d 349, 363 (E.D.N.Y. 2005) (striking allegations referring "to investigations by the attorney general that did not adjudicate any of the underlying issues before the Court"). "Moreover, even if those allegations were relevant, courts hold that references in pleadings to administrative investigations that do not result in adjudication of underlying issues are immaterial and can properly be stricken under Rule 12(f)." *Id.* Here, the Complaint contains allegations and attaches an exhibit concerning a 2013 regulatory settlement with the New York Department of Financial Services. *See* ECF No. 1 ¶¶ 21-24, 78, 79, 135; ECF No. 1-18. As the consent order itself makes clear, however, the Assurant Defendants "neither admit nor deny DFS's Findings and allegations," ECF No. 1-18 at 7, which "Findings and allegations have not been subject to an adjudicatory hearing or judicial process in which [the Assurant Defendants] have had an opportunity to present evidence and examine witnesses." *Id.* at 23.

This is a consent order between a state agency and private corporations which is not the result of an actual adjudication of any of the issues. Consequently, it cannot be used as evidence in subsequent litigation between those corporations and another party. The consent order was the result of private bargaining, and there was no rulings or any form of decision on the merits. Allegations about unadjudicated investigations of LPI practices are immaterial and should be

stricken.  *See Lipsky v. Commw. United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976) ("This is a consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues.  Consequently, it cannot be used as evidence in subsequent litigation between that corporation and another party…. The consent decree entered into by the SEC and CUC was the result of private bargaining, and there was no hearing or rulings or any form of decision on the merits by the district court."); *see also Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp, Inc.*, 2014 WL 3569338, at *4 (E.D.N.Y. July 18, 2014) (striking complaint's references to a regulatory consent order).

The Complaint also contains allegations concerning prior, unadjudicated class action complaints and settlements involving the Assurant Defendants and SPS.  *See* ECF No. 1 ¶¶ 10, 11, 74-77, 163, 206.  These, too, are immaterial and should be stricken.  "Settlement agreements, even those approved by court order, have served as targets of successful motions to strike."  *Dent v. U.S. Tennis Ass'n*, 2008 WL 2483288, at *2 (E.D.N.Y. June 17, 2008).  "In addition to being inadmissible as hearsay, unproved allegations of misconduct are not proof of anything."  *Id.* at *3.  The order granting final approval to the class settlement specifically prohibited allowing the settlement to be, among other things, "offered by any person or received against the Defendants as evidence or construed as or deemed to be evidence of any presumption, concession, or admission by the Defendants of the truth of the facts alleged by any person or the validity of any claim that has been or could have been asserted in the Almanzar Litigation or in any litigation."  *Almanzar v. Select Portfolio Servicing, Inc.*, 2016 WL 1169198, at *8 (S.D. Fla. Mar. 25, 2016).

The hearsay nature of the Complaint's references underscores why they are an inadequate substitute for plausibly alleged facts.  Plaintiff cannot free-ride off allegations asserted in a

regulatory consent order or in the complaints of other parties filing similar lawsuits, but instead must show that *his* Complaint is backed by specific, credible facts.  He has not done so.

## CONCLUSION

The Court should dismiss the Complaint, with prejudice, as to the Assurant Defendants or, in the alternative, the Court should strike Complaint paragraphs 10, 11, 21-24, 74-79, 135, 163, and 206 and Complaint Exhibit 18.

Dated: January 30, 2018

Respectfully submitted,

CARLTON FIELDS JORDEN BURT, P.A.

By: */s/ Robert W. DiUbaldo*
Robert W. DiUbaldo
rdiubaldo@carltonfields.com
Nora A. Valenza-Frost
nzalenza-frost@carltonfields.com
Chrysler Building
405 Lexington Avenue, 36th Floor
New York, New York 10174
Telephone: (212) 785-2577
Facsimile: (212) 785-5203

Frank G. Burt (*pro hac vice*)
fburt@carltonfields.com
Brian P. Perryman (*pro hac vice*)
bperryman@carltonfields.com
1025 Thomas Jefferson Street, NW
Suite 400 West
Washington, DC 20007
Telephone: (202) 965-8100
Facsimile: (202) 965-8104

*Attorneys for Defendants Assurant, Inc. and American Security Insurance Company*